F. W. DRYBROUGH AND ESTATE OF MARION S. DRYBROUGH, DECEASED, CITIZENS FIDELITY BANK AND TRUST COMPANY, EXECUTOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 87956. Filed September 14, 1964.

*Rucker Todd* and *John T. Bondurant*, for the petitioners.
*S. Earl Heilman*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the statutory notice, and asserted increased deficiencies in an amended answer to the petition, in petitioners' income taxes for the years and in the amounts as follows:

| Year | Statutory notice | Amended answer | Total |
|------|-----------------:|---------------:|------:|
| 1956 | $21,450.01 | $75,974.86 | $97,424.87 |
| 1957 | 524,984.14 | 27,646.03 | 552,630.17 |
| 1958 | 31,227.13 | 16,599.05 | 47,826.18 |

A number of issues have been settled by stipulation and will be given effect in a Rule 50 computation. The issues which remain for decision are:

(1) Whether respondent erred in determining that the assumption of existing mortgages by five controlled corporations to which F. W. Drybrough transferred improved real estate in 1957 was for the principal purpose of avoiding Federal income tax on the exchange, or was not for a bona fide business purpose, so that the entire amount of the liability assumed on the exchange is to be considered as money received by F. W. Drybrough on the exchange under section 357(b), I.R.C. 1954;[1]

(2) Whether respondent erred in determining that all of the gain attributable to the depreciable assets in the above transfer is taxable to F. W. Drybrough, and that such gain is taxable as ordinary income under section 1239;

(3) Whether respondent erred in determining that a portion of the interest and mortgage expenses, paid by F. W. Drybrough in 1956 and 1957 on certain mortgage indebtedness incurred in 1953, is nondeductible under section 265;

(4) Whether interest expenses incurred in 1957 are nondeductible under section 265; and

(5) Whether amounts representing contingent fees earned in the years 1956, 1957, and 1958 on the collection of certain accounts receivable known as the white files are taxable to petitioners in those years as ordinary income.

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

F. W. Drybrough (hereinafter sometimes referred to as Drybrough) and Marion S. Drybrough (hereinafter sometimes referred to as Marion) filed timely joint individual Federal income tax returns with the district director of internal revenue for the district of Kentucky for the years 1956, 1957, and 1958.

Marion died testate on September 25, 1961, and Citizens Fidelity Bank & Trust Co. of Louisville, Ky., is the duly qualified and acting executor of her will.

Drybrough became a resident of Louisville, Ky., in 1913. From that time until 1917, he and Marion worked for a collection agency in that city. In July 1917, they left that agency and, together with Marion's sister, started United Mercantile Agencies (hereinafter sometimes referred to as UMA), a Kentucky corporation operating a commercial wholesale collection agency. Drybrough and Marion were married in August 1919.

Drybrough became interested in investing in Louisville real estate about 1920, and between 1920 and 1940 acquired at least 20 or 30 different parcels, principally in the downtown business district. Frequently, he borrowed money to purchase these parcels, and mortgaged the properties as security for the loans.

In 1940, Drybrough owned five parcels of realty, all of which were encumbered by mortgages or vendor's liens. In 1945 he purchased two more parcels; in 1946 he purchased an additional two parcels. In 1940, 1945, and 1946 he borrowed money from the National Life & Accident Insurance Co. of Nashville, Tenn. (sometimes hereinafter referred to as National Life), in the respective amounts of $200,000, $200,000, and $500,000, secured in each case by mortgages on his real estate. Drybrough used the proceeds of the first two loans to pay off a portion of existing loans. Except for $9,028.90 which was paid to Drybrough, the proceeds of the 1946 loan were used by Drybrough to pay off the balance of the 1945 loan and several smaller loans.

On April 30, 1953, Drybrough borrowed $700,000 from National Life. This loan is hereinafter sometimes referred to as the 1953 loan. Drybrough and Marion signed a $700,000 note payable to the order of Lowry Watkins Co., Inc. (sometimes hereinafter referred to as Watkins Co.), brokers, and executed a mortgage covering six properties owned by Drybrough. On the same day Watkins Co. assigned the note and mortgage to National Life. The proceeds of the loan were intended to be, and were, the property of Drybrough. The

mortgage provided for 4½-percent interest and contained provisions allowing prepayments upon the payment of specified bonuses.

Of the $700,000 proceeds of the 1953 loan, Drybrough used $357,-185.16 to pay off preexisting mortgages (including the $307,702 balance due on the 1946 loan from National Life, the same mortgagee), and for brokerage and incidental fees. Drybrough deposited the remaining $342,814.84 in his checking account at the Liberty National Bank & Trust Co. (hereinafter sometimes referred to as Liberty Bank) on April 30, 1953.

Many years ago, Drybrough made a gift to Marion of a business known as the Public Garage. Subsequently she sold the business, but a checking account entitled "Public Garage, M. S. Drybrough, Owner" at the Liberty Bank was continued. This account (sometimes hereinafter referred to as the Public Garage account) was maintained by Drybrough for his wife's business interests. He kept this account at his office, drew checks on the account, and made deposits to it under a power of attorney which he had on file at the bank. The balance in this account as of January 1, 1947, was $20,-353.29. Marion maintained two personal checking accounts for household expenditures upon which Drybrough did not draw checks. The Drybroughs did a great deal of entertaining at their 22-room residence. Drybrough had made a gift of this house to Marion in the late 1930's. Drybrough had an understanding with Marion that he would repay her for household and living expenses she incurred as well as for amounts he withdrew for his own use.

In 1951, Waller Grogan (sometimes hereinafter referred to as Grogan), a certified public accountant, was retained in connection with a pending Tax Court case which involved Drybrough and UMA. While Grogan was working on the case, Drybrough requested him to assemble some information with regard to amounts which his records indicated he owed to Marion. On January 28, 1952, Drybrough wrote Marion a letter which stated, in part:

In the course of preparation on this case I was advised by counsel that it was desirable to have a clear identification and funding of the sums which I now owe you. The reason for this is that you should be fully protected from claims against me and, more particularly, should be protected as to your separate estate in the event of my death.

\*       \*       \*       \*       \*       \*       \*

Enclosed is a complete itemization of the above sums owing to you according to my records. This itemization has been checked by Escott Grogan & Company and with my checkbooks and other records and I believe it is completely accurate. \* \* \*

Drybrough enclosed the papers he received from Grogan, checks totaling $22,234.03, and his demand note for $260,000 dated January 1, 1952.

On May 21, 1953, Drybrough drew a check on his account at Liberty Bank for $208,602 payable to Marion. On the same day this check was deposited in the Public Garage account at Liberty Bank. Of this amount, Drybrough intended $200,000 as a payment on principal of the $260,000 demand note which he had given to Marion on January 1, 1952, $3,602 as interest on that note, and $5,000 as a repayment of an advance from Marion which he had used as part of the purchase price of a parcel of realty on Armory Place. On April 30, 1953, Drybrough also drew a $90,493 check in favor of UMA as repayment of an advance which he had used to purchase the same real estate.

Prior to the deposit of $208,602 on May 21, 1953, the balance in the Public Garage checking account was $77,561.65. During the period thereafter, through November 23, 1953, most of the withdrawals from the account were for 18 separate purchases of municipal tax-exempt securities, in the total face amount of $192,000 purchased at a cost of $196,731.87. The only other withdrawals for other than nominal amounts were for the purchase of 500 shares of Boston Edison Co. stock, at a cost of $23,778.85, on August 12; two 1,000-share purchases of Servel, Inc., stock at a cost of $5,000 each, on October 13 and 15; a loan to United Inv. Corp. on October 28 in the amount of $11,500, which amount was returned and deposited on November 12; and a purchase on August 31, at a cost of $151,377.70, of U.S. Treasury bonds, which bonds were sold and the proceeds of $151,385.85 deposited in the account on the next day. The balance in the account on November 23, 1953, was $70,082.84. On January 7, 1954, additional tax-exempt securities in the face amount of $6,000 were purchased in Marion's name, with funds from the Public Garage account.

In mid-1956, Drybrough contemplated refinancing the outstanding balance of the 1953 loan. A letter dated July 5, 1956, written by Lowry Watkins, president of Watkins Co., to the manager of the National Life loan department, stated in part:

I talked to Fritz [Drybrough] and he is willing to make an application for a 15 year loan at 4¾% interest for $1,525,000.00.

As you know, he wants to make this in 6 or 7 corporation loans but will let us prorate them out. The $900,000.00 he expects to net from these loans he will put in tax exempt securities * * *

On August 22, 1956, Drybrough wrote a letter to National Life, a copy of which he mailed to Lowry Watkins. This copy contained the following two additional paragraphs:

The above tells the story. 620 S. Fifth and the Mexican Village property are both clear and I am eager to mortgage them to the limit before combining these two properties in a corporation.

Please phone me as soon as you are ready to go further with this.

On February 27, 1957, Drybrough wrote a letter to National Life which stated, in part:

When my present mortgage of $700,000 was entered into with your company on April 15, 1953, it was a blanket mortgage covering six pieces of my real estate, two of which have since been released from the mortgage.

\*      \*      \*      \*      \*      \*      \*

For the reasons that follow, I would like to have this blanket mortgage broken into four direct mortgages and suggest $250,000, $100,000, $75,000 and $175,000. I would pay anything over and beyond $600,000 owing at the time of executing the new mortgages and cancelling the old.

As you and Mr. Weaver know and as I explained to you in person several months ago, I have been wanting to incorporate some of my properties and interests for quite a long time.

If you would give me four separate mortgages, you would, first of all, still have me as the maker of the mortgage. Very shortly after I receive these separate mortgages I will give my son a substantial interest in the equity, filing and paying a gift tax. This, then, brings him on the paper and, as I think you know, he has a very substantial estate in his own name completely free of debt. His estate includes two-thirds of the block on the southeast corner of Sixth and Broadway and a very sizable piece on the southeast corner of Eighth and Broadway. In addition, he is the sole heir of his mother's substantial estate, as well as mine.

After clearing up the gift tax situation, we would incorporate the property upon which you hold a mortgage. This will bring about a very substantial income tax saving and there would be no need or purpose in withdrawing the earnings from these corporations. Hence, they would soon be extremely well heeled against adverse conditions or they could retire the mortgage ahead of time, a very good annuity in each instance for my son.

I have abandoned the idea of larger mortgages on these properties as it is obviously much wiser to have the minimum carrying charge instead of the maximum. Secondly, by leaving these mortgages where you placed them several years ago I could almost certainly negotiate a more favorable evaluation of the equity both for gift and inheritance tax purposes than I could if I had present day appraisals pushed to the limit, and this particularly at a time when there is no need for more money in the family. Other than my indebtedness to you and a much lesser one to Mrs. Drybrough, I am free of all debt, including income taxes to date. As a matter of fact, I have a ninety some odd thousand dollar refund coming from a very favorable decision in the 6th Circuit Court of Appeals last December. Mrs. Drybrough's estate, the same as Junior's, is completely free of obligations. Also, there is your paying experience with me, which now covers more than fifteen years, upwards of 200 monthly payments, every one of which has been made before the due date. During all these years every tax bill has been discounted. The property is always well maintained and fully insured.

So will you please accept this as my request to break the present blanket mortgage into four individual ones on the same terms and conditions? While I have suggested an allocation above, I am willing that you arrange that in any way you wish.

In a letter dated the same day, written by Drybrough to Lowry Watkins, Drybrough said, in part:

Over the past many months I have discussed my tax situation with many people with a background for helpfulness and other than the loan on 620 South Fifth, I have decided against going into any further debt.

The $700,000 blanket mortgage referred to in the letter to National Life was not broken up, principally because the mortgagee would have raised the interest rate and reinstated the prepayment penalty clause of the original mortgage.

A financial statement prepared by Drybrough, as of December 31, 1956, showed cash of $103,397.67, tax-exempt bonds of $206,100, and a tax refund due of $90,000. It also showed an asset entitled "UMA, Incorporated," in the amount of $231,642.46, and his explanation therefor was: "This is the balance due me from the U.M.A. Incorporated assets, which are liquidating rapidly. Should receive all of this before the end of 1957. It is tax paid." In addition to these quick assets, he showed an asset of $600,000 representing a "modest estimate" of the value of his proprietorship known as United Mercantile Agencies. In addition, he listed as an asset Vic's Parking Stations, which included real estate which had a value of $1,044,400 on June 1, 1957. The only liability shown on the financial statement other than the balance of the long-term liability to National Life on the 1953 loan was a note payable to Marion for $215,000 (which was a new note to her; the note he had given to her on January 1, 1952, was paid off completely on October 15, 1954), and an estimated balance on 1956 income taxes of $40,000. Attached to a letter dated September 8, 1955, written by Drybrough to the president of the Liberty Bank, was a financial statement signed by Drybrough showing a comparable financial position as of September 8, 1955.

On February 28, 1957, Drybrough owned approximately $210,000 of tax-exempt securities. From the period March 18, 1955, to July 1, 1957, he bought tax-exempt securities in the face amount of $449,400, and on July 1, 1957, he had on hand such securities with the total face amount of $421,800. From May 1, 1953, to July 1, 1957, there were purchased in Marion's name tax-exempt securities in the face amount of $513,500, and at the end of the period, $434,100 thereof were still on hand.

In a memorandum dated February 13, 1957, concerning an application for a $150,000 loan by "A corporation to be formed, and [by] F. W. Drybrough, individually," the manager of the Liberty Bank's mortgage loan department stated, in part, to the bank's board of directors:

Mr. Drybrough approached the writer and requested the mortgage loan as set forth in the caption. He stated that the purpose for which he desired this loan was to assist him in making a further distribution of his personal estate through gifts to his son. By the payment of gift taxes on gifts made during his lifetime, he is able to minimize the estate taxes which will be due and payable at his death.

\*     \*     \*     \*     \*     \*     \*

## 1036

Attached hereto is a statement of F. W. Drybrough, dated December 31, 1956, indicating a net worth of $4,038,000.

Mr. Drybrough controls the following accounts, which are carried at our Fourth Avenue Office:

| | | |
|---|---|---|
| United Mercantile Company | Averages | $140,000 |
| Mr. Drybrough's personal account | " | 20,000 |
| Mrs. Drybrough's personal account | " | 15,000 |
| Public Garage | " | 14,000 |
| Vic's Parking Station—Stamp Account | " | 4,000 |
| Vic's Parking Station | " | 3,000 |
| 5 parking lot accounts | " | 4,000 |

We recommend that the loan be approved, as requested.

On December 31, 1956, Drybrough knew that he was going to get a tax refund as a result of a decision of the U.S. Court of Appeals for the Sixth Circuit which he "estimated to be $85,000 plus a year and a half of interest." On June 4, 1957, Drybrough deposited $95,048.18 from this refund in his Liberty Bank checking account.

On March 15, 1957, Drybrough obtained a 15-year $150,000 loan at an interest rate of 5 percent from the Liberty Bank. The loan, hereinafter sometimes referred to as the 1957 loan, was secured by a mortgage on real estate known as 620 South Fifth Street, which was owned by Drybrough. This property had been released from the 1953 loan on August 22, 1956. The proceeds of the loan were intended to be, and were, the property of Drybrough. Drybrough deposited the cash proceeds of the loan to his Liberty Bank checking account on March 15, 1957.

Drybrough drew checks totaling $210,358.41 on his Liberty Bank checking account for 16 purchases of tax-exempt securities between the date of the deposit of the proceeds of the 1957 loan on March 15, 1957, and July 1, 1957, in the total face amount of $208,000. In the last half of 1957 he made additional purchases of tax-exempt securities.

A portion of the 1953 loan and all of the 1957 loan were incurred by Drybrough to purchase tax-exempt securities.

On May 15, 1957, Drybrough made a gift to his 22-year-old son, F. W. Drybrough, Jr. (sometimes hereinafter referred to as Drybrough, Jr.), of an undivided 40-percent interest in the real estate known as 620 South Fifth Street. The deed transferring this interest was recorded by Drybrough, Jr. At the time of this transfer, the property was encumbered by the mortgage securing the 1957 loan, and the transfer was made subject to that loan.

In June 1957, Drybrough caused to be formed five new corporations. In exchange for all of their stock, Drybrough (together with Drybrough, Jr., in the case of the 620 South Fifth Street property) transferred the real estate which had been encumbered by the 1953 and 1957 loans. The following tabulation shows the names of newly

formed corporations; the date of incorporation and transfer of property to the various corporations; the total fair market value of the property transferred to the various corporations for all purposes of this case other than computation under Rule 50;[2] Drybrough and Drybrough, Jr.'s total adjusted basis in the property transferred to the corporations, at the date of the transfer; the fair market value of the depreciable improvements at the time of the transfer and incorporation; the liability assumed by 620 South Fifth Street, Inc., on the 1957 loan and the portion of the balance due on the 1953 loan assumed by the other corporations; and the unamortized capitalized loan expense applicable to the loan assumed:

| Name of corporation | Date of incorporation and transfer of property | Total fair market value of property | Drybrough's total basis | Fair market value of depreciable improvements | Drybrough's basis in depreciable improvements | Liabilities assumed | Unamortized capitalized loan expense |
|---|---|---|---|---|---|---|---|
| 620 South Fifth Street, Inc. | 6/28/57 | $238,750 | $103,840.12 | $179,200 | $41,875.50 | $149,000 | $557.75 |
| 655 South Fifth Street, Inc. | 6/ 1/57 | 397,250 | 161,076.16 | 30,000 | 157.03 | 250,000 | 1,543.29 |
| 800 South Fourth Street, Inc. | 6/ 1/57 | 200,000 | 83,682.17 | 49,210 | 8,831.41 | 100,000 | 617.32 |
| 720 South Fifth Street, Inc. | 6/ 1/57 | 212,750 | 83,293.28 | 29,975 | 3,280.42 | 75,000 | 462.98 |
| 725 South Fourth Street, Inc. | 6/ 1/57 | 234,400 | 79,955.94 | 20,560 | 635.32 | 175,000 | 1,080.28 |

All of the shares of stock of the new corporations were issued to Drybrough except in the case of 620 South Fifth Street, Inc.; he received 60 percent of the stock thereof and Drybrough, Jr., received 40 percent. 620 South Fifth Street, Inc., assumed the $149,000 balance of the $150,000 1957 loan; the other four corporations each assumed the stated portions of the $600,000 balance of the 1953 loan.

In their 1957 joint Federal income tax return, Drybrough and Marion reported a long-term capital gain of $223,806.12 from the transfers of property to the newly created controlled corporations. This amount represented the amount of mortgage debt assumed by the corporations which was in excess of Drybrough's basis, excluding the 40-percent undivided interest in the 620 South Fifth Street, Inc., property which was owned by Drybrough, Jr., at the date of the transfer.

Immediately after receiving shares of stock of the four newly formed corporations other than 620 South Fifth Street, Inc., Drybrough transferred by gift to Drybrough, Jr., 40 percent of the stock that he had received in each of these four corporations. These corporations held property on which Drybrough had operated parking

---

[2] The parties have stipulated that the fair market values established in a gift tax proceeding reported at 208 F. Supp. 279 (W.D. Ky. 1962) will be used for the Rule 50 computation.

lots, and will hereinafter sometimes be referred to as the parking lot corporations. Drybrough and Marion filed timely gift tax returns for the year 1957, reporting as taxable gifts to Drybrough, Jr., the 40-percent undivided interest in the property known as 620 South Fifth Street and the gifts of stock of the four other newly formed corporations.

On June 1, 1957, the parking lot corporations each entered into a 1-year lease with Drybrough, doing business as Vic's Parking Stations. The leases called for the payment of percentages of the gross parking receipts, with set monthly minimums. Each lease provided: "It is further agreed that the party of the second part [Drybrough] will provide at his expense insurance of all kinds necessary to keep the party of the first part [the corporation] free from liability of any kind or character whatsoever. Also, second party agreed to pay all charges for water and sewer service." In each case, Drybrough signed the lease both as lessor and lessee, as president of the lessor corporation and for himself as lessee.

The corporations formed by Drybrough were in the business of owning and leasing real property. The property located at 620 South Fifth Street included an office building whose tenants were the U.S. Social Security Administration, under a 5-year lease, and Drybrough, who operated various businesses as a sole proprietor during the taxable years here in issue. The depreciable improvements at 620 South Fifth Street accounted for approximately three-quarters of the total fair market value of the property transferred to 620 South Fifth Street, Inc. The depreciable assets transferred to each of the parking lot corporations accounted for approximately 10 to 25 percent of the total fair market value of the property transferred to those corporations. The principal tenant of these properties was Drybrough, who operated parking lots thereon as sole proprietorships under short-term leases. Most of the day-to-day problems were taken care of by employees of the lessee, but management decisions, such as renewal of leases, improvement of the property, tax reassessments, and general maintenance, were made by officers and employees of the lessor.

Petitioner continued to operate the parking businesses known as Vic's Parking Stations as sole proprietorships after formation of the lessor parking lot corporations. He also owned and rented other real property.

Prior to his application for the 1957 loan, Drybrough discussed his tax situation with his accountants and legal counsel.

During the years 1956–58, UMA was by far the largest non-retail collection agency in the United States. As a part of its business UMA collected delinquent claims and accounts, on a contingent

fee basis, for the owners of such claims. When a customer requested that UMA collect a delinquent claim or account, UMA opened a file in a manila folder, into which it would put all materials relating to that matter. Those involved here are hereinafter sometimes referred to as white files. Other groups of claims were kept in files of different colors. UMA became entitled to payment on these claims only after it had successfully collected all or part of the delinquent amount.

On May 25, 1955, UMA had 375 shares of stock outstanding. Drybrough owned 273 shares, Marion owned 100 shares, and 1 share was held by each of two employees of UMA. Drybrough was president of the corporation. On that date, the shareholders of UMA agreed on a plan for complete and total liquidation and dissolution of the entire affairs, business, properties, and assets of the corporation. There was to be a pro rata distribution of these items to the shareholders in exchange for their stock after cash was set aside to pay all debts of the corporation. On the same date, the board of directors of UMA approved the plan of liquidation adopted by the shareholders.

On May 31, 1955, the board of directors of UMA accepted an offer by Drybrough—

to take all of the assets of the corporation other than cash and pay to the other stockholders in cash or its equivalent their pro rata shares of the fair market value of such assets to which they were entitled in liquidation.

On the same date, the directors resolved that the assets other than cash be distributed at the end of business on that day and that $100,000 of cash on hand be distributed pro rata to the shareholders. At the time the corporation was liquidated, Drybrough's and Marion's interests in its assets were valued by him at $929,778.03. The white files were not recorded as an asset on the books of account of UMA or carried on its financial statements at the time of dissolution.

On May 31, 1955, UMA had in its possession approximately 7,000 white files which related to claims in a total face amount (uncollected balance) of approximately $5 million.

These white files contained correspondence, memoranda, and other writings relating to the collection of delinquent accounts receivable that the owners of those accounts had forwarded to UMA as agent for collection on a contingent fee basis. The delinquent accounts had not been referred to UMA under a written contract. The understanding was that UMA would make an effort to collect the accounts and would be compensated in accordance with the schedule of mini-. mum fees set by the Commercial Law League of America. In the event that collection of a particular account proved unusually difficult, UMA and the owner of the account negotiated concerning additional fees. Occasionally, the owners of an uncollected account requested that UMA return it and such requests were complied with.

UMA never paid any consideration to a customer for obtaining from the customer the right to collect a delinquent account which was the subject of a white file. UMA did not own any delinquent account that was the subject of a white file. UMA had a field organization acting both as solicitors and adjusters. UMA's acquisition expense was about 3 percent of "dollar volume" of the "docketed" claims referred to it; this expense consisted of compensation to employees, automobile expense, traveling expense, and advertising. The acquisition cost of the white files was accounted for as business expense in the form of payroll and general expenses.

The claims comprising the white files represented the older and more difficult cases. From time to time UMA referred delinquent accounts receivable that were the subject of the white files to independent attorneys for collection, on a fee basis. On May 31, 1955, approximately 79 percent in number of the white files were in the hands of independent attorneys pursuant to such referrals. The fees paid outside attorneys amounted to two-thirds of UMA's fees, and UMA's fees were reduced accordingly. About 40 percent of the white files acquired were finally abandoned without collection.

Upon liquidation of UMA in 1955, physical possession of the white files was transferred to Drybrough, who purchased the interests of Marion and the two other shareholders for $80,000 and $1,600, respectively.

From June 1, 1955, to December 31, 1958, Drybrough, through a proprietorship styled "United Mercantile Agencies," conducted essentially the same business activities which UMA had conducted in corporate form prior to June 1, 1955. On the books of account of the proprietorship, the white files were recorded as an asset with a value of $300,000. Drybrough reported gain in connection with his receipt of the white files and paid a capital gains tax thereon. As fees were collected from clients as compensation for services rendered in the collection of the accounts, such fees were credited to the white files account. Drybrough collected the following amounts of fees with respect to the white files in the periods indicated:

| Period | Amount |
|---|---|
| June 1–Dec. 31, 1955 | $132, 396. 18 |
| 1956 | 88, 399. 18 |
| 1957 | 30, 380. 25 |
| 1958 | 22, 540. 48 |
| | 273, 716. 09 |

No separate records of white files collections were kept after March 1959, when a new corporation was formed by Drybrough to take over the assets of the proprietorship. During the years 1956, 1957, and 1958, Drybrough reported gross income from the proprietorship of

$503,721, $648,982.17, and $728,506.79, respectively. These amounts do not include receipts from the white files, which Drybrough treated as a recoupment of the $300,000 basis he had assigned to those files in the 1955 liquidation. Drybrough did, however, deduct as current business expenses of the proprietorship amounts expended in the collection of white file accounts. The total business expenses claimed by Drybrough in connection with the collection proprietorship for 1956, 1957, and 1958 were $485,557.66, $581,332.96, and $623,995.41, respectively.

The white files had an ascertainable fair market value on May 31, 1955.

OPINION

*Issue 1*

The first issue for decision is whether Drybrough has sustained the burden of proof imposed upon him by section 357(b) and has shown that his principal purpose in certain transfers was a bona fide business purpose and was not the avoidance of Federal income taxes. A short historical sketch of the origin of section 357(b) is helpful in deciding this question.

In 1938 the Supreme Court decided *United States* v. *Hendler*, 303 U.S. 564 (1938), which held that liabilities assumed in section 351-type transfers were taxable to the transferor. In the aftermath of *Hendler*, Congress enacted section 112(k) of the 1939 Code,[3] to accord nonrecognition treatment to certain corporate adjustments. In order to differentiate between those transactions which justified nonrecognition and those which did not, section 112(k) placed the burden on the taxpayer of proving by the clear preponderance of the evidence that his principal purpose with respect to the assumption of liability was not to avoid Federal income tax on the exchange and was a bona fide busi-

---

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(k) ASSUMPTION OF LIABILITY NOT RECOGNIZED.—Where upon an exchange the taxpayer receives as part of the consideration property which would be permitted by subsection (b) (4), (5), or (10) of this section to be received without the recognition of gain if it were the sole consideration, and as part of the consideration another party to the exchange assumes a liability of the taxpayer or acquires from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as "other property or money" received by the taxpayer within the meaning of subsection (c), (d), or (e) of this section and shall not prevent the exchange from being within the provisions of subsection (b) (4), (5), or (10) ; except that if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange. In any suit or proceeding where the burden is on the taxpayer to prove that such assumption or acquisition is not to be considered as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

ness purpose. If the taxpayer failed of this burden, the liability assumed was to be treated as money received by the taxpayer upon the exchange. Since the assumption of the liability by the corporation in a section 351 tax-free transfer released funds to the transferor taxpayer there was inherent the possibility that this transfer could be used by taxpayers to avoid taxes. The exception in section 112(k) was passed to deal with this situation.[4]

Section 357(b) of the 1954 Code[5] is a reenactment of the above-mentioned exception clause of section 112(k). Section 357(c)[6] adds to what was section 112(k) a provision whereby the excess of the liabilities assumed over the transferor's basis is treated as a gain on the exchange. Drybrough reported gain on the exchange under section 357(c); respondent contends that such gain comes within the purview of section 357(b) and that Drybrough has failed to sustain the burden imposed upon him by such section. We agree with respondent.

Drybrough asserts that his purposes for the transactions herein involved were: Decreasing the amount of his gross estate for death tax purposes, the making of gifts to his son, the perpetuation of family holdings and the flexible management thereof, the avoidance of personal liability on future loans, and the facilitation of improvements that might be added to individual properties. Assuming, *arguendo*, that the above motives constituted bona fide business purposes, cf. *Jack L. Easson*, 33 T.C. 963 (1960), revd. 294 F. 2d 653

---

[4] See Surrey, "Assumption of Indebtedness in Tax-Free Exchanges," 50 Yale L.J. 1 (1940), for a more detailed discussion of sec. 112(k).

[5] SEC. 357. ASSUMPTION OF LIABILITY.
(b) TAX AVOIDANCE PURPOSE.—
(1) IN GENERAL.—If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—
(A) was a purpose to avoid Federal income tax on the exchange, or
(B) if not such purpose, was not a bona fide business purpose,
then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351, 361, 371 or 374 (as the case may be), be considered as money received by the taxpayer on the exchange.
(2) BURDEN OF PROOF.—In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

[6] SEC. 357. ASSUMPTION OF LIABILITY.
(c) LIABILITIES IN EXCESS OF BASIS.—
(1) IN GENERAL.—In the case of an exchange—
(A) to which section 351 applies, or
(B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),
if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.
(2) EXCEPTIONS.—Paragraph (1) shall not apply to any exchange to which—
(A) subsection (b)(1) of this section applies, or
(B) section 371 or 374 applies.

(C.A. 9, 1961), Drybrough still has failed to establish that his principal purpose was not that of tax avoidance.

It is always difficult to determine subjective intent, but "taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption * * * was made," we find that Drybrough has fallen far short of sustaining his burden of proof. While the reasons he has given are not implausible, when they are considered in conjunction with all his activities regarding the properties here involved we are not persuaded that the reasons he has given constituted his principal purpose in this situation. We believe that these reasons were in large part afterthoughts on the part of Drybrough and his tax advisers, assembled to provide an economic justification for a tax-motivated transaction. See, e.g., *Clearview Apartment Co.*, 25 T.C. 246, 253 (1955); *Thomas E. Snyder Sons Co.*, 34 T.C. 400, 406 (1960), affd. 288 F. 2d 66 (1961); *Pauline W. Ach*, 42 T.C. 114, 128 (1964); *Urban Redevelopment Corporation*, 34 T.C. 845, 851 (1960), affd. 294 F. 2d 328 (C.A. 4, 1961).

In 1953 when Drybrough placed the $700,000 blanket mortgage on his properties, he received approximately $342,000 in cash, which he deposited in his personal checking account. With these proceeds he paid off amounts advanced by UMA and Marion and transferred $208,602 to the Public Garage checking account. The bulk of this latter amount went toward purchasing tax-exempt securities in Marion's name, and none of the proceeds in the 1953 loan were used in connection with the encumbered real estate. Drybrough urges that the focal point of our inquiry should be his purpose with respect to the assumption on the exchange and contends that Congress was concerned with the "taxpayer's specific purpose in having a liability assumed and not with taxpayer's reason for entering into the tax-free exchange." In view of the introductory language of section 357(b), i.e., "taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption * * * was made," we cannot read this section in the restrictive manner urged by Drybrough. We believe that it is relevant to the 1957 assumption of Drybrough's liabilities by the newly formed corporations to consider the nature of the liability assumed. When the 1953 loan was made to Drybrough, he received more than half of the mortgage proceeds; when the corporations assumed the $600,000 outstanding balance, Drybrough was relieved for all practical purposes of the liability to pay back any of the mortgage indebtedness. The mortgages assumed by the corporations were secured by the properties owned by the corporations, the values of which were well in excess of the amount of the outstanding loan balance. Thus, although Drybrough stood as surety for the corporate indebtedness, he would not, as

a practical matter, have been called upon to satisfy the liabilities, except in the most unusual circumstances. Thus, when the entire set of transactions is viewed as a whole, what has occurred is that Drybrough has received a substantial amount of cash which, under his theory, he is not obligated to repay and upon which he will not be required to pay Federal income tax. It is precisely this situation with which Congress intended to deal when it passed section 112(k) of the 1939 Code. See *Jack L. Easson, supra* at 967, 970.

Drybrough's testimony that his business purposes outweighed the tax considerations inherent in this set of transactions has not persuaded us. He appeared to us to be a man of considerable business experience and quite aware of the tax consequences which would result from these transactions. He maintains the largest collection agency in the country, and has many other business interests, especially in the real estate field. He was quite conscious of taxes, having discussed his tax affairs with his accountants, attorneys, and banker. While normally tax planning and reduction of tax liability by legitimate means will not adversely affect a taxpayer, section 357(b) is to be applied if the taxpayer fails to show that tax avoidance was not his principal purpose, regardless of whether such avoidance comes within any other provision of the Code. Drybrough's correspondence with Lowry Watkins and National Life reflect his tax-consciousness. On August 22, 1956, Drybrough stated in a letter to Watkins that he was "eager to mortgage them [the 620 South Fifth Street and another property] to the limit before combining these two properties in a corporation." On February 27, 1957, in a letter to National Life requesting that the 1953 loan be broken into four mortgages, Drybrough stated that he had been "wanting to incorporate some of my properties and interests for quite a long time"; that he would give his son a substantial interest in the equity and pay a gift tax thereon; and that "After clearing up the gift tax situation, we would incorporate the property * * *. *This will bring about a very substantial income tax saving* and there would be no need or purpose in withdrawing the earnings from these corporations. Hence, they would soon be extremely well heeled against adverse conditions or they could retire the mortgage ahead of time, a very good annuity in each instance for my son." (Emphasis supplied.) We are unpersuaded by Drybrough's contention that these letters were merely "salesmanship" on his part in order to be able to obtain the loans he desired.

By having the corporations assume his liabilities, Drybrough was relieved of making the mortgage payments, which could thereafter be made from the earnings of the corporations while his net equity in the properties remained unchanged by the transfer. Further, the

corporations received deductions for interest paid and took depreciation on the new, higher bases of the properties.

In August 1956 the property at 620 South Fifth Street was released from the 1953 blanket mortgage. On March 15, 1957, Drybrough remortgaged this property as security for a new $150,000 loan from the Liberty Bank. The proceeds of this loan were not used in connection with the property at 620 South Fifth Street. In May 1957 Drybrough made a gift to his son of an undivided 40-percent interest in the above property. In June 1957 Drybrough and his son transferred their respective interests in the property to a newly formed corporation which assumed the $149,000 outstanding balance on the March 15, 1957, loan. It is Drybrough's contention that the assumption of this mortgage, like the assumption by the four parking lot corporations of portions of the 1953 mortgage, was not done principally to avoid Federal income taxes but was done for a bona fide business purpose. We cannot accept this contention. We accord but little weight to any of Drybrough's contentions as to the substantiality of the business purposes which he contends motivated him to encumber the 620 South Fifth Street property with a new $150,000 loan just 2 months before the incorporation of 620 South Fifth Street, Inc., and its assumption of the loan. The instant situation is very similar to the situation in *W. H. Weaver*, 32 T.C. 411 (1959), affirmed sub nom. *Bryan v. Commissioner*, 281 F. 2d 238 (C.A. 4, 1960). In that case the petitioner used personal funds and proceeds of loans upon which he was personally liable to acquire land and construct houses thereon. After construction was completed he transferred the property to four corporations in exchange for their stock and assumption of all of his liabilities. The liabilities were approximately $158,000 greater than petitioner's basis in the properties. The corporations obtained FHA loans and paid off the assumed indebtedness immediately. We held that petitioner's principal purpose was the avoidance of Federal income tax and that under section 112(k) of the 1939 Code gain was to be recognized to the extent of the indebtedness assumed.

In the instant case, 620 South Fifth Street, Inc., assumed the $149,000 balance on the $150,000 loan which Drybrough had obtained 2 months prior to its incorporation. Similarly, the four parking lot corporations assumed portions of the 1953 blanket mortgage loan, releasing Drybrough from his primary obligation on this debt. While we are aware of no requirement that Drybrough have paid off the 1953 loan before transferring the properties to the corporations, Drybrough has presented us with no substantial bona fide business purpose for placing the new $150,000 loan on the 620 South Fifth Street property, and, except insofar as it further increased his financial liquidity, no business purpose which was served by the release of the mortgage

proceeds for his use. Drybrough contends that he had other business ventures in mind for which he wished to have liquid capital available, but during 1956 and 1957 Drybrough had sizable amounts of tax-exempt securities which were readily marketable and could have been used for his other investments.

The large amount of tax-exempt securities held by Drybrough and by Marion, and their intrafamily relationships, further substantiate respondent's contention that Drybrough was extremely tax-conscious. While for purposes of this issue we need not pass on the validity of the "debts" which Drybrough claims to have incurred by drawing on the Public Garage account, and on the bona fides of the "debt" which Drybrough "repaid" Marion in 1953 for household expenses she incurred, we believe that the purported debtor-creditor relationship was arranged largely because of tax considerations. Drybrough appears to have had full control over the Public Garage checking account, and could have drawn on it to finance his business ventures. Marion, during these taxable years, had substantial amounts of tax-exempt securities in her name, which we believe Drybrough could have used to take advantage of any business opportunities which might have suddenly arisen. He also could have borrowed further capital, if necessary, for such ventures. While we do not suggest that he should have looked to these sources for future business ventures, because of the existence of these assets we give little credence to Drybrough's testimony that his need for financial liquidity was a prime consideration in structuring the transactions here involved. The existence of substantial amounts of tax-exempt securities in both Drybrough and Marion's names, as well as the purchase of additional tax-exempt securities after the 1953 and 1957 loan transactions, indicate to us the acute awareness which Drybrough had of the tax benefits which could be obtained by receiving tax-exempt income, and, at the same time, interest deductions on mortgage debt. See *Thompson* v. *Campbell*, —— F. Supp. —— (D. Tex. 1964).

Another indication of Drybrough's tax-consciousness in the formation of the corporations and their assumption of the outstanding mortgages is the manner in which Drybrough structured these transactions. His gifts to his son of 40-percent interests in the properties were made in two different fashions. The four parking lot corporations received the properties from Drybrough and *then* he made a gift of 40 percent of their stock to his son, whereas, in the case of the 620 South Fifth Street property, Drybrough first made a gift of a 40-percent undivided interest in the property to his son and then they *both* transferred the property to the newly formed corporation. In this manner, the latter transaction did not come within the literal language of section 1239 and Drybrough expected to receive capital gains thereon. Drybrough has suggested no reason why he handled

this transaction differently from those involving the parking lot properties,[7] and since it involved the largest amount of gain attributable to depreciable property, we conclude that it was done primarily because of the tax considerations.

Based upon the above indicia of Drybrough's concern with the tax consequences of the transactions here involved, several other less significant instances of his tax planning, plus the lack of credence which we give to Drybrough's contentions that he was motivated principally by bona fide business purposes, we find that Drybrough has failed to sustain the burden imposed upon him by section 357(b)(2). Because he has failed to sustain this burden, the assumption of Drybrough's liabilities shall be considered as money received by him on the exchange, for purposes of section 351. As stated in the legislative history of section 357(b)(1):

Where such a tax avoidance purpose exists, the total amount of the liabilities assumed will be considered as money received by the taxpayer and not merely a particular liability with respect to which the tax avoidance purpose existed. * * * [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 270 (1954).]

Drybrough contends that the 620 South Fifth Street transaction should be treated differently than those involving the four parking lot properties, in that the latter group involved the assumption of mortgages which were expanded over the years rather than newly created. We believe that Drybrough had the same purpose with regard to all the properties: the avoidance of tax on the proceeds which he would have after the existing mortgages were retired. We believe that the transfers to each of the five newly formed corporations runs afoul of 357(b), whether we view them as separate, unrelated transfers, or as part of an overall plan.

### Issue 2

It is respondent's contention that the entire amount of gain on the above transfers is taxable to Drybrough, and that the gain attributable to the depreciable assets is taxable as ordinary income under section

---

[7] Drybrough's testimony on this point was as follows:

Q. What was the reason why you handled 625 [620] South Fifth Street corporation different from the way you handled the other four?

A. This is surmise. I would suspect that in talking about these things, which of course my wife and I would do together, because it was our child. I suspect we thought that was the way to do it while we were actually jelling our thinking, I think I used that word this morning, in 1956, we were jelling our thinking. And when it finally jelled as it did in '57, a month or so later we came to the conclusion it was better to do it the other way. Now which was right or which was wrong, I don't know.

Q. What was that conclusion based on?

A. I just guess not being sure what to do, or how to do it.

Q. Well, there surely must have been some reason to make this one different from the other four.

A. What it was I wouldn't know, because my son was in on these things, and we were talking about corporations then, and we finally put them all in the same category for all the many reasons as have been enumerated here today.

1239.[8]  Drybrough contends that he is taxable only on 60 percent of the gain relating to the transfer made by him and Drybrough, Jr., to 620 South Fifth Street, Inc., and that this transfer created no gain taxable as ordinary income since the transfer does not fall within section 1239; he concedes that the transfers to the four parking lot corporations do fall within that section.  We agree with petitioner.

Respondent acknowledges that the provisions of section 1239 do not expressly apply to the 620 South Fifth Street property transfer.  He contends, however, that the gift by Drybrough to his son of a 40-percent undivided interest in the property was a sham and should be disregarded for tax purposes; that the entire gain from the transfer be taxable to Drybrough; and that having disregarded the gift as a sham, we should find section 1239 applicable.

While we believe that Drybrough structured the 620 South Fifth Street property transfer differently from those concerning the four parking lot properties principally, if not solely, because of the tax advantages to be derived, we cannot agree with respondent that the transfer of an undivided 40 percent of the property to his son was a sham.  Respondent does not dispute the validity of the gift under Kentucky law.  It has been stipulated that the gift was made; the deed transferring the property interest to Drybrough, Jr., was recorded; Drybrough and Marion reported the gift and paid a gift tax thereon; and in his 1957 income tax return Drybrough reported only 60 percent of the gain from the sale of the property.  Whether or not the transfer was motivated by tax savings, it was in substance what it purported to be in form: a gift of a 40-percent undivided interest from Drybrough to his son.  See *United States* v. *Cumberland Pub Serv. Co.*, 338 U.S. 451 (1950); *United States* v. *Isham*, 17 Wall. 496 (1873).

Section 1239 is designed to prevent capital gains treatment on the sale of a depreciable asset by an individual to his spouse or to a controlled corporation, who could then obtain depreciation deductions on the higher basis.  For purposes of this section, a controlled corporation is one "more than 80 percent in value of the outstanding stock

---

[8] SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

(1) between a husband and wife; or

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren :

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) SECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.— This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

of which is owned by such individual, his spouse, and his minor children and minor grandchildren." In the instant case, 620 South Fifth Street, Inc., was not such a controlled corporation because Drybrough, Jr., was not a minor. Section 1239 specifically enumerates those relationships which will give rise to attribution of stock ownership; it excludes adult children from its coverage. Cf. sec. 318(a)(1)(A)(ii). On the date of the transfer, Drybrough, Jr., was the legal owner of 40 percent of the stock in 620 South Fifth Street, Inc. Whether or not Drybrough could in fact control his actions, the provisions of section 1239 are not applicable, when the minority interest is owned by an adult son and the gain recognized to Drybrough on the transfer is not to be treated as ordinary income. Cf. *Mitchell* v. *Commissioner*, 300 F. 2d 533 (C.A. 4, 1962), reversing 35 T.C. 550 (1960); *J. Henry DeBoer*, 16 T.C. 662 (1951), affd. 194 F. 2d 289 (C.A. 2, 1952); *Stern* v. *Commissioner*, 215 F. 2d 701 (C.A. 3, 1954), reversing 21 T.C. 155 (1953).

## *Issue 3*

Section 265 of the 1954 Code provides that no deduction shall be allowed for interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from Federal income tax, and for expenses allocable to such income.[9] Respondent has disallowed two-sevenths of the deductions claimed by Drybrough in 1956 and 1957 for interest expense and mortgage loan fees in connection with the 1953 loan, on the ground that they are not allowable under section 265. Drybrough contends that the $700,000, 1953 loan was not incurred or continued by him to purchase or carry tax-exempt securities. He does not deny that funds released to him from the loan were used ultimately to purchase tax-exempt securities; his contention is that these purchases were made by or for Marion after she had received the money from him as either the repayment of a valid debt, or in the alternative, as a gift. We have concluded that the transfer of funds by Drybrough to Marion was without substance, and we hold for respondent on this issue.

---

[9] SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.
No deduction shall be allowed for—
(1) EXPENSES.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under section 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle.
(2) INTEREST.—Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle.

Incident to pending Tax Court litigation in 1951, Drybrough requested his accountant to compile a list of the amounts which Drybrough's records indicated that he owed Marion under his agreement to repay her for household and living expenses and for sums which he had borrowed from her Public Garage account. On January 28, 1952, Drybrough enclosed the itemization in a letter to Marion, together with his promissory note for $260,000. On April 30, 1953, Drybrough borrowed $700,000 from National Life. He used $357,185.16 to pay off preexisting mortgages and for various fees, and deposited the remaining $342,814.84 in his checking account. On May 21, 1953, Drybrough drew a check for $208,602 payable to Marion. Drybrough intended $200,000 as a payment of principal on his $260,000 demand note, $3,602 as interest thereon, and $5,000 as repayment of an advance Marion had made to him. The check was deposited the same day in the Public Garage account, which had a balance of $77,561.65. Between May 21, 1953, and November 23, 1953, withdrawals were made from this account for 18 separate purchases of tax-exempt securities at a cost of $196,731.87, and for certain stock purchases. Additional purchases of $6,000 face amount of tax-exempt securities were made from the Public Garage account funds between November 23, 1953, and January 7, 1954. The balance in the account on November 23, 1953, was $70,082.84. From May 1, 1953, to July 1, 1957, there were purchased in Marion's name tax-exempt securities in the face amount of $513,500, and as of July 1, 1957, $434,100 thereof were still on hand. Between March 18, 1955, and July 1, 1957, Drybrough purchased tax-exempt securities in the face amount of $449,400, and on July 1, 1957, $421,800 thereof were still on hand.

In support of his contention that no part of the interest deduction claimed in 1956 and 1957 should be disallowed, Drybrough advances four alternative positions. The first is that his delivery of the 1952 note to Marion related to a valid and subsisting indebtedness, and that expenses incurred on the 1953 loan are deductible regardless of what Marion did with the money she received from its proceeds.

We reject this contention. The indebtedness which Drybrough alleges to be bona fide relates to household and family expenses incurred by Marion, and to various loans which she made to him when he needed cash for investments. The Liberty Bank checking account, styled "Public Garage, M. S. Drybrough, Owner," was the source of the funds which Drybrough contends he partially repaid to Marion with the 1953 loan proceeds. Pursuant to advice of counsel, Drybrough requested his accountant to prepare a list of the amounts that his records indicated he owed Marion. On April 30, 1953, Drybrough borrowed $700,000 from National Life. On May 21, 1953, he drew a check for $208,602 in favor of Marion, which was deposited in the

Public Garage account. Between that day and January 7, 1954, over $200,000 of tax-exempt securities were purchased from the funds in this account.

In light of the contrary evidence in the record, we view the fact that the account from which the funds used to purchase the securities were withdrawn was styled "Public Garage, M. S. Drybrough, Owner," and Drybrough's testimony that the funds therein were the property of Marion exclusively, as insufficient to establish that these funds were in reality her separate property. The records relating to the account were kept by Drybrough, at his office. He had complete control over the account, whether or not he did actually consult with Marion about the use of the funds therein. Although the account was in Marion's name only, Drybrough was authorized to, and regularly did, draw checks thereon for his own use. He also made deposits to the account. The only testimony as to the source of funds in the account is that the account was started with the proceeds of the sale of the Public Garage property of which Drybrough had made a gift to Marion many years ago. The amount of such proceeds is not in evidence. The earliest bank statements in the record indicate a balance of only $20,353.29 on January 1, 1947. Drybrough has failed to introduce evidence to show how this amount generated loans of $282,234.03 to him, or that Marion had separate income during these years which supplemented her funds in the account. See, e.g., *Michael Potson*, 22 T.C. 912, 930 (1954), affirmed on other issues sub nom. *Bodoglau v. Commissioner*, 230 F. 2d 336 (C.A. 7, 1956); *Richard F. Smith*, 31 T.C. 1, 6 (1958). When asked about Marion's net worth between 1941 and 1952, Drybrough would not even make an estimate.[10] The account was separate from the two personal accounts which Marion maintained at home; Drybrough kept this account at his office. He testified that he "kept that checkbook going for convenience" and "carried that account for her business interests, not her home interests." Withdrawals from the account, however, were almost exclusively for nonbusiness items such as deposits to Marion's personal account to defray household expenses, other family expenses, tax payments, Drybrough, Jr.'s school tuition, and loans to Drybrough himself. We believe that the account was

---

[10] Q. How much money did Marion S. Drybrough have in her own right during these years?
A. Oh, I wouldn't have any idea.
Q. Do you have any idea what her net worth was in 1941?
A. No.
Q. Or '42, I should say?
A. No.
Q. Any of the years '42 through '51?
A. No. I don't even know what her net worth was when she died. That has to be determined.
Q. You have a general idea though, do you not, of her net worth in, say, '51?
A. No.

kept in Marion's name only as a mere formalism, which existed solely to alter tax liabilities. Cf. *Woodward* v. *United States*, 208 F. 2d 893 (C.A. 8, 1953).

Drybrough places much reliance on the fact that his letter to Marion in January 1952 was accompanied by a schedule prepared by Waller Grogan, a certified public accountant. This schedule was prepared from Drybrough's records, and purports to be nothing more than an itemization of amounts which Drybrough told Grogan he owed to Marion. Grogan merely made a compilation from the Public Garage account, check stubs and deposit tickets; he did nothing to ascertain independently whether Drybrough was indebted to Marion for these amounts.[11]

It is axiomatic that intrafamily transactions are to be given special scrutiny. Under all the circumstances here present and in the absence of any evidence other than Drybrough's own statements and the accountant's characterization based on Drybrough's statement to him, we conclude that the amounts which Drybrough maintains he owed Marion in 1952 were not a valid indebtedness. We believe that most, if not all, of the funds in the Public Garage account were not Marion's separate property, but belonged to Drybrough, and that the promissory note which he gave her in January 1952 was not bottomed upon any valid indebtedness.

Drybrough's second contention is that even if he did not owe Marion $260,000 when he delivered his promissory note to her, there was a running account between them which was liquidated and settled by the delivery and acceptance of the note. Because we believe there was no bona fide debtor-creditor relationship between Drybrough and Marion, we reject this contention.

Drybrough's third alternative contention is that the delivery of his note to Marion created a valid and subsisting indebtedness. We reject this contention since we have found that the Public Garage account, into which Drybrough's check was deposited, was not the separate property of Marion. Both the delivery of the note and the payment thereon were merely the shifting of Drybrough's funds from one account to another. Because Marion received the $200,000 payment in form only, Drybrough's fourth contention, that he made a valid gift to her, is also ill-founded.

The record is silent as to who actually made the purchases of tax-exempt securities with funds from the Public Garage account. It is

---

[11] Grogan's letter to Drybrough, enclosing his itemization, referred to it as "a list of items to be reimbursed by you to Mrs. Drybrough." When asked at trial why he used this terminology, Grogan replied:

Why only because he had told me that "I owe my wife these various sums of money," so that reimbursement naturally follows that as the night follows the day. So I suppose I used that as I thought it was a proper expression of my understanding of the state of his mind.

clear, however, that by having them purchased in Marion's name, Drybrough hoped to avoid the application of section 265(2) and be able to deduct interest payments on the 1953 loan on their joint income tax return without having to report income from the tax-exempt securities. We believe that this situation comes within the statutory provision, which was designed "to prevent the escape from taxation of income properly subject thereto by the purchase of exempt securities with borrowed money." *Denman* v. *Slayton*, 282 U.S. 514, 519 (1931). The fact that the loan was incurred by Drybrough while the tax-exempt securities were purchased in Marion's name is of no moment. *Bernard H. Jacobson*, 28 T.C. 579 (1957).

The purpose for which Drybrough incurred the interest expenses was to effect the purchase of tax-exempt securities, not to carry on a legitimate business function, see *R. B. George Machinery Co.*, 26 B.T.A. 594 (1932); *Sioux Falls Metal Culvert Co.*, 26 B.T.A. 1324 (1932), or to pay a valid indebtedness. The factual situation in this case is similar to that in *Bernard H. Jacobson, supra*, where the petitioner therein and his wife obtained loans by giving as collateral common stock, deposited the loan proceeds in custodial accounts, and then made purchases of tax-exempt bonds through these accounts. We rejected petitioners' contentions that the predecessor of section 265 was inapplicable because the indebtedness itself must be incurred to acquire tax-exempt securities rather than merely part of the proceeds being so used; and because the acquisition was through the custodial accounts rather than by the indebtedness itself. We believe that our rejection of these contentions in the *Jacobson* case, and discussion thereof, is applicable here. Furthermore, Drybrough is not entitled to any credit for the amount of cash in the Public Garage account when the loan proceeds were deposited. As we said in *Jacobson*:

Simply because such other assets are available does not make it necessary to take them into consideration. We have to look at what was actually done. Here the cash balances were available in the custodian accounts at the times of the purchases of tax-exempt securities but they were still there after the purchases and obviously they were not used to make the purchases.

Alternatively, even if Drybrough had a valid indebtedness, or had made a gift to Marion of this portion of the loan proceeds, we believe that section 265 would apply to the transactions involved, since Drybrough's purpose in obtaining the loan in the amount of $700,000 was to effect the purchase of tax-exempt securities. That he would accomplish his purpose by having the securities purchased in Marion's name is immaterial, since the net effect would be to offset an interest deduction with tax-exempt income, as proscribed by the statute. *Denman* v. *Slayton, supra*. See also *J. George Gold*, 41 T.C. 419, 428 (1963).

We uphold respondent's determination that $200,000 of the 1953 loan was invested by Drybrough in tax-exempt securities, and the

interest expense incurred in connection with this portion of the loan is not deductible, under section 265(2). The expenses allocable thereto are similarly not deductible under section 265(1).

### Issue 4

Respondent has disallowed the entire amount of interest expense ($1,021.37) deducted by Drybrough in 1957 in connection with the $150,000 1957 Liberty Bank loan under section 265. Drybrough contends that he made the loan to provide funds for the purchase of two pieces of property and that his purchase of tax-exempt securities was merely a temporary investment pending consummation of the purchases. He further contends that only a portion of the loan proceeds were used to purchase tax-exempt securities. We agree with respondent.

On March 15, 1957, Drybrough borrowed $150,000 from the Liberty Bank, and deposited the net proceeds of the loan, $149,442.25, into his checking account. Between March 15, 1957, and July 31, 1957, he drew checks totaling $210,358.41 on this account for 16 purchases of tax-exempt securities in the face amount of $208,000. One of these purchases was of $100,000 face amount of Frankfort, Ky., PHA notes, for which Drybrough paid $100,189.26 on April 10, 1957. These notes were sold by Drybrough on July 31, 1957, for $100,646.97.

On brief, Drybrough requested a finding only as to this purchase of Frankfort, Ky., PHA notes, and bases his argument on the assumption that this was the only purchase which he made with the funds he received from the 1957 loan. He contends that this was only a temporary investment, made by him in anticipation of the purchase of property which was consummated on August 2, 1957, for $106,599.75, and that only a portion of the loan was used to purchase tax-exempt securities. The record does not support his position. Drybrough ignores 15 other purchases of tax-exempt securities between the time he received the loan proceeds and the time he sold the Frankfort, Ky., PHA notes, as well as his other purchases of tax-exempt securities in 1957. We have no way of knowing exactly how the proceeds of the 1957 loan were applied. At the time he received the proceeds, Drybrough and Marion each owned substantial amounts of tax-exempt securities ($421,800 and $434,100, respectively, on July 1, 1957). A financial statement which he prepared, as of December 31, 1956, indicated cash on hand of $103,397.67; $206,100 in tax-exempt securities; a tax refund due of approximately $90,000; $231,642.46 of proceeds from the liquidation of UMA which he expected to receive during 1957; and other substantial, nonliquid assets. That Drybrough chose to incur further indebtedness by mortgaging the 620 South Fifth Street property, rather than drawing on his existing holdings, in order

to finance the purchase of another parcel of realty, appears to us to be more than coincidental. We believe that his purpose in obtaining the loan was to purchase further tax-exempt securities, the relatively low yield of which would be offset by interest deductions which he hoped to obtain. That he then sold the Frankfort, Ky., PHA bonds to finance the acquisition of another parcel of realty does not appear to be related to the original loan. We decline to trace the proceeds of the loan, via the bonds, to the purchase of the property. See *Constance M. Bishop*, 41 T.C. 154 (1963), on appeal (C.A. 6, 1964); *Bernard H. Jacobson, supra.* We do not believe that the tax-exempt securities were purchased as a temporary investment. Cf. Rev. Rul. 55–389, 1955–1 C.B. 276; *R. B. George Machinery Co., supra; Sioux Falls Metal Culvert Co., supra.* They were, rather, part of Drybrough's general plan of acquiring such securities to maximize his income after income taxes, and come within the proscription of section 265. Both his communications with National Life and with Lowry Watkins reflect such intentions. He stated in a letter to National Life, dated February 27, 1957, that there was "no need for more money in the family," and Watkins' statement in a letter to National Life, dated July 5, 1956, that Drybrough intended to put the net proceeds of an anticipated loan into tax-exempt securities, are but two examples of statements which belie Drybrough's contentions. We hold for respondent on this issue.

### Issue 5

The last issue for decision is whether or not amounts received by Drybrough as contingent fees from the white files in 1956, 1957, and 1958 were taxable to him as ordinary income. On August 8, 1960, the case of *United Mercantile Agencies*, 34 T.C. 808 (1960), was filed. In that case we rejected respondent's determination that UMA, Drybrough's corporation, had realized taxable income with respect to the white files upon its dissolution in 1955. The petition and answer in the instant case having already been filed, respondent filed an amended answer, wherein he determined that the contingent fees from the white files were taxable to Drybrough as ordinary income. Accordingly, the burden of proof is upon the respondent on this issue. We find that he has failed to sustain it.

Briefly, the facts are as follows: On May 25, 1955, the shareholders of UMA agreed upon a plan of complete liquidation with a pro rata distribution of the corporate assets. One of the corporate assets was a total of approximately 7,000 white files which related to claims approximating $5 million in uncollected balances. These white files contained the correspondence, memoranda, and other items relating to the collection of the delinquent accounts receivable which had been forwarded to UMA for collection on a contingent fee basis. At the

time of the liquidation Drybrough purchased the interests of Marion and the other two shareholders of UMA and on the next day began conducting a similar collection business through a proprietorship styled United Mercantile Agencies. The white files were recorded on the proprietorship's books of accounts as an asset with a value of $300,000, and Drybrough paid a capital gains tax on this amount incident to the liquidation. Receipts from the white files between June 1, 1955, and December 31, 1958, totaled $273,716.09, and were treated by Drybrough as a recoupment of the $300,000 basis which he had assigned to these files. Amounts expended in the collection of the white file accounts were deducted as current business expenses of the proprietorship. At issue is the proper treatment of the amounts received during the 1956, 1957, and 1958 taxable years.

It is respondent's position that the white files had no value upon the liquidation and that, alternatively, Drybrough's right to collect the white file accounts and earn the contingent fees did not constitute a capital asset, so that Drybrough had no basis therein. This position is based upon respondent's contentions that no consideration was paid by the corporation for the files; that they were not recorded as an asset on the corporate books of account; that the accounts could be recalled; and that our decision in *United Mercantile Agencies, supra*, requires such a finding.

These contentions are without merit. The contingent nature of the white file accounts and the lack of ownership therein does not negate the possibility that the white files had a value in Drybrough's hands; nor does our statement in *United Mercantile Agencies, supra* at 817 and 818, upon which respondent relies heavily:

Here, the only income which could be realized from the White files consisted of fees which were wholly contingent upon the actual collection of all or a part of the delinquent accounts. It mattered not how much time, money, and effort were expended upon an attempt to collect. No contractual or *quantum meruit* right arose from such expenditures. No conceivable income could accrue for services rendered which failed to produce the collection of the accounts. None of the White files turned over to Drybrough had been collected. *Unsuccessful attempts to collect had produced nothing of value whatsoever.*

     * * * *A letter or telephone call to a delinquent debtor which produces no payment is worthless. A collector who calls in person upon the debtor and fails to collect has produced nothing of value.* [Emphasis supplied by respondent.]

Taken in the context of that case, the statement cited above is perfectly consistent with our finding, in this case, that the white files had a value at the date of liquidation. In that case the issue presented for decision was whether or not the *corporation* had "earned" any income from the white files which it transferred to its shareholders in liquidation. The issue in this case is whether the files, which consisted not only of the physical documents, but also of the underlying claims and the rights to collect such claims, had any value as assets distributed in the cor-

porate liquidation. It appears clear to us that the files did have a value on the date of liquidation despite the fact that the corporation had not yet earned any income thereon. Certainly a prospective purchaser of the corporate assets would have paid a substantial sum for the files and the right to collect the accounts which the files represented. To anyone engaged in the business of collecting delinquent accounts, such files represent a principal asset. There was testimony that Drybrough had found the average acquisition cost of his accounts to be approximately 3 percent of the face amount of the claims which they represented. Drybrough and H. E. Mahorney, an officer of UMA, both testified that the white files had an ascertainable fair market value. Furthermore, respondent has introduced no evidence to show that the $300,000 value, which Drybrough placed on the white files on the basis of his business experience, was in any way unreasonable or inaccurate.

Drybrough used the sum of $300,000 as the fair market value of the white files on the date of liquidation and assigned this amount as his basis for this asset which he received in the liquidation, presumably under section 334(a).[12] He reported gain on this transaction and paid a capital gains tax thereon.

During the taxable years 1956, 1957, and 1958, which are in issue here, Drybrough reported no gain on the contingent fees which he received. In so doing Drybrough relied upon a portion of our decision in *United Mercantile Agencies, Inc.*, 23 T.C. 1105 (1955), modified on other issues 238 F. 2d 735 (C.A. 6, 1957), wherein this Court approved such a procedure in connection with UMA's purchase of a mixed aggregation of claims from the liquidators of four insolvent banks. We held that it was impractical to apportion the acquisition cost to each item since each had a different, speculative value and that, therefore, the corporation need not report profit until it had recovered its cost. We believe that the same rationale applies in the instant case. See *William T. Piper*, 5 T.C. 1104 (1945); *Webster Atwell*, 17 T.C. 1374 (1952); and *Burnet* v. *Logan*, 283 U.S. 404 (1931). Respondent has failed to show that the white files could, as a practical matter, be valued separately. Each file represented a different claim, the value of which was not determinable on the date of liquidation. Cf. *Gordon D. Seigle*, 33 T.C. 255 (1959).

Likewise, respondent has not shown, or attempted to show, that the white files were a mass asset which would constantly be replenished

---

[12] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(a) GENERAL RULE.—If property is received in a distribution in partial or complete liquidation (other than a distribution to which section 333 applies), and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution.

by new accounts. Cf. *Richard M. Boe*, 35 T.C. 720 (1961), affd. 307 F. 2d 339 (C.A. 9, 1962); and *Westinghouse Broadcasting Co.*, 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962). Since the parties were able to stipulate as to the proceeds from the white files from the date of liquidation until December 31, 1958, and separate records were kept for the white files until March 1959, we assume that the white files were handled separately, in any event.

In arguing that the white files were not capital assets, respondent contends that they represented personal service contracts to be performed in the future. Respondent does not attempt to specify wherein the white files do not constitute capital assets under section 1221;[13] but relies on the definition of gross income found in section 61(a)(1)[14] and a portion of section 1.61–2, Income Tax Regs.,[15] and cases such as *Thurlow E. McFall*, 34 B.T.A. 108 (1936); *David L. Gordon*, 29 T.C. 511 (1957), affd. 262 F. 2d 413 (C.A. 5, 1958); and *Merten E. Farr*, 11 T.C. 552 (1948) affirmed sub nom. *Sloane v. Commissioner*, 188 F. 2d 254 (C.A. 6, 1951).

We cannot agree with respondent's interpretation. The cases dealing with personal service contracts are not in point. They involve situations where the transferors were obligated to perform future services and attempted to sell their employment contracts and receive

---

[13] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

    (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

    (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

    (3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

        (A) a taxpayer whose personal efforts created such property, or

        (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

    (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

    (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

[14] SEC. 61. GROSS INCOME DEFINED.

    (a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

    (1) Compensation for services, including fees, commissions, and similar items;

[15] Sec. 1.61–2 Compensation for services, including fees, commissions, and similar items.

    (a) *In general.* (1) Wages, salaries, commissions paid salesmen, compensation for services on the basis of a percentage of profits, * * * are income to the recipients unless excluded by law. * * *

capital gains treatment. In the instant case there was no payment to Drybrough as a substitute for the right to future compensation. When the corporation distributed the white files to Drybrough in complete liquidation, Drybrough took a basis in the files and applied the proceeds of his collection efforts to recover his basis in the files. He was in a position analogous to that of the purchaser, not of the seller, of the personal service contracts such as those involved in the cases cited by respondent and has a basis which he is entitled to recover before reporting gain on the collection. That neither UMA nor Drybrough was the legal owner of these files does not affect our decision. The fact that he may have paid only a capital gains tax on the receipt of the white files in the 1955 liquidation is a result of the treatment accorded by section 334(a), and does not disqualify him from recouping the $300,000 basis which he reported.[16]

*Decision will be entered under Rule 50.*

---

[16] Respondent has not suggested apportionment of Drybrough's basis to his collections, and the record is lacking the factual foundation for how such an apportionment might be made. Cf. *Morton Liftin,* 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963).