**URBAN REDEVELOPMENT CORPORA-TION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

**No. 8334.**

United States Court of Appeals Fourth Circuit.

Argued June 16, 1961.

Decided Sept. 19, 1961.

Fred R. Tansill, Washington, D. C. (Goodwin, Rosenbaum, Meacham & White, Washington, D. C., on brief), for petitioner.

Kenneth E. Levin, Atty. Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys. Dept. of Justice, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is a petition for review by the taxpayer of a decision of the Tax Court, reported in 34 T.C. 845, No. 87 (August 15, 1960). The basic facts stated herein appear to be undisputed and were either stipulated by the parties or found by the Tax Court.

Urban Redevelopment Corporation, sometimes hereinafter referred to as Urban or taxpayer, is a New York corporation organized on October 16, 1949. Until July 14, 1953, its principal place of business was in New York City, but on that date its office was moved to Alexandria, Virginia, and it was qualified to do business in Virginia. The corporation filed its tax returns for fiscal years ending on September 30, 1954, and September 30, 1955, with the District Director of Internal Revenue in Richmond, Virginia.

For those years the taxpayer deducted losses incurred during the prior tax years of 1950, 1951 and 1953 to offset otherwise taxable income of $81,802.68 in fiscal 1954 and $36,295.58 in fiscal 1955. The deductions were claimed under Int.Rev.Code of 1939, § 122(b), 26 U.S.C.A. § 122(b), and Int.Rev.Code of 1954, § 172(a) and (g), 26 U.S.C.A. § 172(a, g). Section 172(g) of the Int. Rev.Code of 1954 returns us to Int.Rev. Code of 1939, § 122(b), the governing section for all tax years here involved. That section provides, in pertinent part, that net operating losses incurred after December 31, 1949, may be carried forward for each of the five succeeding taxable years. The Commissioner of Internal Revenue disallowed the deduction, however, and the Tax Court, concurring with the Commissioner, found that the principal purpose for the purchase of

taxpayer's stock by its sole stockholder, who will indirectly receive the benefit of a deduction, was avoidance of federal taxation and held that taxpayer was not entitled to the deductions under Int. Rev.Code of 1939, § 129, 26 U.S.C.A. § 129 (Int.Rev.Code of 1954, § 269, 26 U. S.C.A. § 269). These sections provide that if, on or after October 8, 1940, any person or persons acquire control of a corporation and the principal purpose for such acquisition is evasion or avoidance of federal income tax by securing the benefit of a deduction, credit or allowance which such person would not otherwise enjoy, then such deduction, credit or other allowance shall not be allowed.

According to Urban's certificate of incorporation, its principal objects and purposes are generally to buy, sell, lease, construct or otherwise deal in real and personal property. It was empowered to conduct these activities throughout the United States.

Prior to May 20, 1953, one Fred F. Stoneman acquired all of Urban's authorized, issued and outstanding stock, both common and preferred. Between the date of incorporation and May 20, 1953, Stoneman lent various sums to Urban and on the latter date, to evidence the obligations, Urban issued to Stoneman a promissory note, payable on demand, for $5,321.26 with six per cent interest.

Urban incurred net operating losses (before adjustment necessary under Int. Rev.Code of 1939, § 122, to determine the proper net operating loss carry-over) for the years indicated and in the stated amounts as shown below:

Fiscal year ended September 30

| | |
|---|---|
| 1950 | $55,006.15 |
| 1951 | 74,815.11 |
| 1953 | 378.35 |

During 1952 the taxpayer was inactive and had neither profit nor loss.

Randolph Rouse, in 1953 and prior thereto as early as 1947, was a land developer and builder in Virginia. He is shown to be the principal stockholder and dominant personality in several con-

struction corporations. Through a mutual acquaintance, Rouse was introduced in 1953 to Allen Thurman, a resident of Arlington, Virginia, and agent for Stoneman in respect to the sale of the latter's stock in Urban. Thurman introduced Rouse to Stoneman and negotiations for the sale of stock in Urban were carried on among the three individuals.

In the course of negotiations, Thurman stated that Urban had among its assets certain plans for the construction of multiple-unit dwelling houses.[1] Rouse was shown a letter dated June 20, 1950, from Eugene Greenhut to Urban indicating that certain architectural plans, specifications and other related data for a proposed housing project in Boston, Massachusetts, had been sold to Urban for an adjusted price of $21,000. Greenhut also indicated that he owned "complete preliminary plans, specifications and other related data" for a proposed housing project in Kansas City. He agreed to sell and the taxpayer agreed to buy the Kansas City plans for $30,000. Greenhut had at some time prior to May 20, 1953, been an officer, director and minority stockholder of Urban. Rouse did not verify the existence or value of the plans; neither he nor his agents ever saw the plans, drawings or specifications prior to the time he purchased the Urban stock. He did see certain rough sketches known as "renderings," however. Rouse made no attempt at any time to purchase the aforementioned plans, drawings, specifications and other related data directly from taxpayer.

During negotiations, Thurman told Rouse of taxpayer's operating losses incurred during particular fiscal years and the exact amounts. Rouse sent his certified public accountant to New York to examine the taxpayer's books and the accountant verified the books and the net operating losses "to almost the dollar." Rouse's attorney also verified the legal corporate existence of the taxpayer.

On or about May 20, 1953, Rouse purchased from Stoneman all the Urban preferred and common stock, together with Urban's note payable to Stoneman (covering its indebtedness of $5,321.26 to Stoneman) for the sum of $12,250. During the taxable years ending in 1954 and 1955, Urban, the stock of which was wholly owned by Rouse, engaged in the construction and sale of detached residential property in the area around Arlington County, Virginia. These operations resulted in substantial profits. As the sole stockholder of Urban, Rouse would alone benefit through a reduction of Urban's income taxes resulting from its loss carry-overs.

After Rouse acquired control of Urban, he made some ineffectual efforts to secure possession of the plans, specifications and drawings represented to be assets of the taxpayer. As president of Urban, Rouse wrote a letter to Stoneman on February 15, 1954, in which he recited the representation by Thurman that certain plans were the property of Urban and would be delivered to Rouse in connection with his purchase of the stock. He requested that Stoneman make the plans available immediately. On March 9, 1954, Rouse wrote to Greenhut reciting the representation by Thurman that the plans and other data were in Greenhut's possession and stating that the plans were then urgently needed. He asked that Greenhut advise him as to whether and when the data could be picked up. Rouse next conferred about the matter with taxpayer's attorney who, on April 5, 1954, wrote to Greenhut and, on behalf of the taxpayer, made formal demand for the property. There was no compliance with the demand nor was there any effort made to follow up or pursue the matter further and the main plans and specifications were never obtained. Only a few miscellaneous files and plats of no real value were recovered.

---

[1]. The cost of these plans was entered on Urban's books as an expense; their value was not shown on the balance sheet as an asset. As of May 20, 1953, the only item listed in the "Assets" column of the balance sheet was "Organizational Expense . . . . $400."

The Tax Court also found as ultimate facts that Rouse had acquired, after October 8, 1940, control of Urban by a purchase of all of its outstanding stock and that his principal purpose in acquiring this stock was the avoidance of federal income tax by securing the benefit of deductions, namely, for net operating losses incurred by the taxpayer in the years 1950 and 1951 which he, Rouse, would not otherwise have enjoyed.

The taxpayer's main point on appeal is that the Tax Court's finding concerning Rouse's purpose in acquiring the Urban stock is not supported by the evidence. It is contended that the Tax Court clearly erred when it failed to accept Rouse's uncontroverted testimony that his main purpose in acquiring taxpayer's stock was to obtain the plans, drawings and specifications belonging to the corporation and not for the purpose of avoidance of federal taxes.

Rouse and taxpayer's attorney, both called by taxpayer, were the only witnesses before the Tax Court. Their testimony was not contradicted by other witnesses or by cross-examination. Rather, most of the Tax Court's findings (excepting only those based on the facts as stipulated and the few exhibits) were taken from the testimony of these two witnesses. In the words of taxpayer, "It only remains to be considered, then, whether or not their disregarded testimony was (1) inherently improbable in some respects but not in all, and (2) whether internal analysis of such testimony destroyed its credibility."

We agree with the Tax Court that Rouse's stated reasons for acquiring Urban's stock are "inherently improbable," and that internal analysis of Rouse's testimony destroys his credibility as to his primary purpose in purchasing the stock.

Taxpayer alleges that the Tax Court's finding that Rouse never made any attempt to purchase the plans and specifications directly from it is only "a half truth." The other half of the truth, it is contended, is that Rouse, as a prudent business man, preferred to purchase one hundred per cent of the corporation's stock rather than its assets and that this could not have been done with a Virginia corporation. No reason is even suggested why one cannot purchase all of the stock of an existing Virginia corporation, but taxpayer does suggest that the Virginia Code requires a minimum of three incorporators to form a new corporation. The court takes judicial notice of the fact that Virginia corporations must have at least three natural persons to serve as incorporators[2] and that they must have at least three directors,[3] but there is no provision that incorporators or directors must be stockholders.[4] Rouse testified that the cost of forming a Virginia corporation was "about three or four hundred dollars." Thus it is inherently improbable that a prudent business man would spend $12,500 to acquire a corporate form when a new corporation could have been created for approximately one-thirtieth of that amount. On the other hand, it is very probable that an alert business man would eagerly take advantage of an opportunity to acquire potential tax benefits aggregating amounts several times greater than an investment of $12,500.

Next, taxpayer raises the point that Rouse, an experienced builder, could determine the value and be assured of the existence of the plans and specifications which he allegedly was seeking to acquire by merely seeing and studying some architectural "renderings." To us it is inherently improbable that a business man who is prudent enough to have his certified public accountant verify the taxpayer's net operating losses "to almost the dollar," and his attorney check the legality of the corporate structure

---

2. Va.Code (1950) § 13.1–48.

3. Va.Code (1950) § 13.1–36.

4. See Va.Code (1950) § 13.1–35, which, in part, states: "Directors need not be stockholders of the corporation unless the articles of incorporation so require."

and of status of taxpayer, would fail to check the existence and ready availability of the very property which, according to him, he was seeking to acquire by purchasing the Urban stock. There is no intimation that Rouse relied upon Greenhut's reputation as an architect when considering the acquisition of these plans by this indirect method. In fact he later viewed Greenhut as a "slippery character," according to the testimony of Urban's attorney. The mere fact that there was a showing that taxpayer paid Greenhut, one of its former officers and directors, over $50,000 for the plans does not prove either their existence or their true value.

As stated, Rouse wrote a few letters and made some unsuccessful efforts to obtain possession of the plans subsequent to his acquisition of the Urban stock. He took no legal action, however, against Greenhut, who allegedly had possession of the plans, or against Stoneman to rescind the contract. It is suggested that Rouse thought Greenhut to be judgment proof and consequently saw no reason to "throw good money after bad" in suing him. Upon the record there is no apparent reason why an action could not have been brought against Greenhut to recover the plans themselves rather than a money judgment. There is no suggestion that Stoneman was considered financially irresponsible and unable to respond to judgment had an action to rescind the contract been brought against him.

■ It is true, as the taxpayer points out, that, as a general rule, positive testimony as to a particular fact, uncontradicted by anyone, should control a decision of the court. This rule has many exceptions, however, and does not aid the taxpayer here. One such exception, as taxpayer is aware, is that inherent improbability in the statements of a witness will induce the court to disregard his testimony. Thomas E. Snyder Sons Co. v. Commissioner, 7 Cir., 1961, 288 F.2d 36, certiorari applied for, 30 U.S.L. Week 3003 (July 4, 1961); Winters v. Dallman, 7 Cir., 1956, 238 F.2d

912; Archer v. Commissioner, 5 Cir., 1955, 227 F.2d 270. Rouse testified that his primary purpose in purchasing taxpayer's stock was not to avoid taxes but to acquire a going corporation, a capital item that would appreciate in value, and the architectural plans and other materials which the corporation allegedly owned. This uncorroborated testimony of a highly interested witness is, in the light of the objective evidence, simply unrealistic.

■■ This court reviews decisions of the Tax Court in the same manner and to the same extent as it reviews decisions of the district courts in civil actions tried without a jury, and thus the findings of fact below must be "clearly erroneous" before we can reverse. Int.Rev.Code of 1954, § 7482(a), 26 U.S.C.A. § 7482 (a); Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A. We cannot say that the ultimate findings of the Tax Court here are clearly erroneous since they are supported by substantial, though circumstantial, evidence.

■■ Thus the claimed net operating loss carry-over deductions, resulting in deficiencies totaling $45,948.37, are denied under § 129(a) of the 1939 Code and § 269(a) of the 1954 Code. Although the Tax Court formerly interpreted these sections to mean that the deduction was barred only when the person acquiring control of the corporation was seeking the benefit of a deduction, and that the sections did not apply where the taxpayer whose control was acquired was claiming the deduction, the courts of appeals uniformly rejected that view. Recently the Tax Court acquiesced in the interpretation adopted by the appellate courts. It is now well established that the deduction should be disallowed when, under circumstances as outlined above, it is claimed by either the acquired corporation or by the person who acquired control of the corporation and who will get the benefit of the deduction, albeit, indirectly. Coastal Oil Storage Co. v. Commissioner, 4 Cir., 1957, 242 F.2d 396; Mill Ridge Coal Co. v. Patterson, 5 Cir., 264 F.2d 713; certiorari denied, 1959,

361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63, rehearing denied, 1960, 363 U.S. 832, 80 S.Ct. 1595, 4 L.Ed.2d 1526; James Realty Co. v. United States, 8 Cir., 1960, 280 F. 2d 394; Thomas E. Snyder Sons Co., 1960, 34 T.C. 400, affirmed Thomas E. Snyder Sons Co. v. Commissioner, 7 Cir., 1961, 288 F.2d 36, certiorari applied for, 30 U.S.L. Week 3003 (July 4, 1961).

Finally, the government contends that the deduction of the net operating loss carry-overs should be disallowed for the additional reason that the income against which the offset is claimed was not produced by the same business enterprise which incurred the losses. See Libson Shops, Inc. v. Koehler, 1957, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924, rehearing denied, 354 U.S. 943, 77 S.Ct. 1390, 1 L.Ed.2d 1542. In view of our holding it is unnecessary to discuss or decide the applicability of that decision. The decision of the Tax Court is

Affirmed.