FRANK C. DEBROUSE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
DeBrouse v. Commissioner
Docket No. 1487-86.
United States Tax Court
T.C. Memo 1988-119; 1988 Tax Ct. Memo LEXIS 147; 55 T.C.M. (CCH) 416; T.C.M. (RIA) 88119; March 17, 1988. Albert J. Ahern, Jr., for the petitioner. Robert A. Miller, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Addition to Tax
Year
Deficiency
Section 6653(b) [1]
1972
$  5,877
$  2,939
1973
72,715
36,358
*148 After concessions, the issues to be decided are whether: (a) petitioner received unreported income during the years at issue from goods and services that he allegedly received at no cost or at a reduced cost due to his position as president of a labor union; (b) if so, whether his failure to report that income was due to fraud; and (c) whether the assessment is barred by the effective statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Davidsonville, Maryland, when he filed his petition herein. He filed joint Federal income tax returns with his wife for both of the years at issue. [2]
Background
Petitioner attended elementary and high school in Baltimore, Maryland. He served three years in the United States Marine Corps after graduating *149 from high school, and then attended the University of Maryland for two years. He began working for Local 639 of the Teamsters Union in November of 1957. He was elected to the position of business agent in 1960, after working approximately three years as an organizer. He served as business agent from 1960 to late 1967. In late 1967, the president of Local 639, who was petitioner's uncle, had both of his legs amputated. Following the amputations, the president was incapable of running Local 639. He appointed petitioner to the position of assistant to the president and petitioner ran Local 639 in that capacity from late 1967 to 1969. In 1969, petitioner was elected president of Local 639. He served as president until June of 1977, when he left office after he lost a bid for reelection. Petitioner became acquainted with Alvin Dobbin and Larry Campbell through his work at Local 639. Both Dobbin and Campbell worked for firms that employed members of Local 639. Dobbin met petitioner in the early 1960's. Dobbin was responsible for the food distribution operations of Giant Food, Inc. ("Giant"), a supermarket chain. All of the truck drivers who distributed food from Giant's *150 warehouses to its retail stores were members of Local 639. Giant could not operate for more than a few days without their services. Dobbin and petitioner had frequent business and personal contacts from the time they met through the years at issue. Larry Campbell was part owner and general manager of a construction company named Excavation-Construction, Inc. ("Excavation-Construction"). Excavation-Construction had millions of dollars of contracts for work in the Washington, D.C., area. Some of its larger contracts included the following: Contract Date
Project
Amount
3/11/72
Sewage Treatment Plant
$ 17,025,914
5/11/73
Subway Stations
28,250,454
5/31/73
Subway Station
7,023,727
2/1/74
Highway
28,265,051
5/9/74
Highway
27,495,199
2/19/76
Subway Station
20,680,620
Excavation-Construction employed between 80 and 100 truck drivers who were members of Local 639 and Campbell dealt with petitioner in connection with labor matters. Dirt moving was an important part of the firm's operations. The drivers who were members of Local 639 were essential to its operations as they drove the dump trucks that moved the dirt. In December *151 of 1969, petitioner held a Christmas party at the offices of Local 639. The party was attended by Dobbin and Dobbin's superior at Giant Food, Israel Cohen. While at the party, Cohen commented that the decor of petitioner's office was unmasculine and suggested that petitioner have someone redesign it. Petitioner agreed with Cohen that the decor was inappropriate. About a week later, Dobbin called petitioner and said he was coming by with another Giant employee, Robert Picardat. Picardat was responsible for designing Giant's stores. Picardat advised petitioner on how the decor of the office could be improved. Petitioner took Picardat's advice and redecorated his office. Transactions at Issue
1. Design Work - Petitioner subsequently purchased a lot near Ocean City, Maryland, and decided to build a beach house on it. His wife had found a home design and floor plan that she liked in a magazine, and he called Dobbin to request Giant's help in drafting plans that could be presented to home builders for bids. Dobbin checked with Israel Cohen, who approved having Picardat assigned to assist petitioner. Either Cohen or Dobbin then asked Picardat to help petitioner design *152 the beach house. Shortly thereafter, Picardat was terminated from Giant. His severance agreement provided that he was to receive severance pay from Giant for one and one-half years and was to continue to accept assignments from Giant during that period. Picardat first visited petitioner's home to discuss the beach home. Petitioner's wife thereafter met with Picardat at his office, which by that time was no longer at Giant, to refine the plans. Picardat designed the beach house in March, April, and May of 1972. While he was preparing the plans, Picardat found it necessary to have an engineering firm design the roof. The engineering firm designed the roof during April and May of 1972 and billed Giant $ 1,860 for the work. Giant paid the bill. While Picardat was designing the beach house, petitioner located a lot in Davidsonville, Maryland. He decided to build a home on the lot to serve as his family's main residence and abandoned his plans to build the beach house. Petitioner purchased the lot on June 2, 1972. Picardat stopped work on the plans for the beach house, which were still incomplete, when he heard from either Dobbin or Cohen that petitioner had abandoned his plans *153 to build a beach house. By that time, Picardat had devoted at least 79.5 hours to the project. Cohen told Picardat that petitioner had decided instead to build a home in Davidsonville, and authorized him to assist with the design work. Petitioner or petitioner's wife visited Picardat and presented him with a portfolio of drawings and clippings from magazines that depicted features they wanted included in the home. Picardat completed his work on the plans for the house by September 25, 1972. The only amount that petitioner paid with respect to the design work was $ 181.84 for blueprints that Picardat had paid for personally. In addition to drafting the plans of the house itself, Picardat also performed interior design work for petitioner. The design work included activities such as visiting showrooms to select fabric. In total, Picardat spent about 1,000 hours designing the house. 2. Home Construction - In approximately November of 1972, petitioner presented Picardat's plans to the developer of the subdivision in which the home was to be built. Petitioner was required to submit the plans to the developer for approval, and the developer had the right to bid on constructing *154 the house. The developer was happy to approve the plans, as the house impressed him as a "palatial, beautiful home." However, he was not actually interested in building the home, as he was too busy with other projects. After spending about an hour estimating the cost of the home, he put in a token bid of $ 160,000. He made it plain that the bid was only a rough estimate of what the house would cost, and that he would only build the home on a cost-plus basis. [3] Petitioner did not pursue the offer. Petitioner then asked Picardat to obtain an estimate of what it would cost to construct the house in accordance with the plans. Picardat obtained an estimate of about $ 210,000 from a builder who made a conscientious effort to arrive at an accurate estimate. The builder was nevertheless unwilling to commit to building the house for that amount as the plans contained unusual features, the cost of which he found difficult to estimate confidently. The builder instead wanted to perform the *155 work under a cost-plus contract. Petitioner did not hire the builder. He told Picardat that he thought he could get the home built for less money by another contractor, and that he thought he could get the house built for less than $ 100,000 by "calling in favors." He told a friend that he expected to be able to have the house built for about $ 130,000 by obtaining discounts from the prices that would normally be charged. Petitioner told Campbell, the part owner and general manager of Excavation-Construction, that he was looking for a builder to build the home. Campbell referred petitioner to Lyon Builders, Inc. ("Lyon Builders"), which was owned by his partner in Excavation-Construction, John Lyon. Lyon Builders normally built commercial buildings such as parking garages, and had little if any expertise in building homes. It nevertheless offered to build the house in accordance with Picardat's plans for a fixed price of $ 170,000. Lyon Builders knew when it made its offer that Picardat had obtained an estimate of $ 210,000. Petitioner accepted the Lyon Builders' offer. Construction started in the early spring of 1973. During construction, Lyon Builders made changes *156 to the house that petitioner or his wife requested. The changes had not been included in Picardat's original plans, and the finished house varied considerably from those plans. Petitioner was aware that the changes would increase the cost of his home. Both Lyon and Campbell were also aware that the house was costing more than $ 170,000 to construct. Lyon Builders completed work on the house by the end of 1973 and its final bill to petitioner was $ 289,890. Petitioner refused to pay that amount. Lyon Builders nevertheless released the liens it held against the house in December of 1973. It did so to obtain the final $ 25,000 draw due it from a construction loan obtained by petitioner. Lyon Builders received a total of $ 135,000 from petitioner for its work on the house. [4]
In late 1973, Campbell and Mr. Jenkins, a representative from Lyon Builders, met with petitioner and discussed the bill for the house. They notified him then that the costs they had incurred in building the house exceeded petitioner's payments by about $ 150,000. Petitioner indicated that he would *157 not pay that entire amount, saying he thought the costs were excessive and that he was being charged for materials that had been diverted to another project. Lyon Builders offered to meet with petitioner to determine and discuss the specific costs to which petitioner objected. No such meeting ever took place. Lyon Builders also offered to settle the dispute by abiding by the opinion of a qualified appraiser, acceptable to both parties, as to the reasonable value of the house at the time it was completed by Lyon Builders. No such settlement ever occurred. Campbell persuaded Lyon not to sue petitioner for the excess of the building cost above the $ 135,000 petitioner had paid. He was afraid that a dispute with petitioner would lead to labor problems for Excavation-Construction. Lyon Builders finally sued petitioner after he was no longer union president. By that time, the statute of limitations had run on the claim, and the suit was terminated in petitioner's favor. 3. Carpet - In September of 1973, petitioner ordered carpet for the house from Giant. Giant billed petitioner $ 10,388.34 for the carpet in November. That amount represented the carpet's retail price. In *158 December, the billing department was notified to give petitioner a $ 3,318.03 discount. The discount was reflected on a consolidated invoice that was mailed to petitioner in January of 1974. The consolidated invoice reflected a total due Giant of $ 7,070.31. That amount represented Giant's cost. Petitioner did not pay the bill. Giant did not attempt to collect the carpet bill from petitioner because he was the president of Teamsters Local 639. Giant was afraid to irritate him. Giant resumed billing petitioner for the carpet when petitioner was no longer president of Local 639. Giant eventually wrote the bill off after petitioner failed to pay it. Other Events
1. Move - Petitioner was moved into his new home in November of 1973 by a mover that employed members of Local 639. Although the mover billed him for the move, petitioner contacted it and settled the bill without paying it. 2. Appliances - In October of 1973, petitioner ordered appliances for his new house from The Jos. M. Zamonski Co. That corporation, which is a wholesale distributor of appliances and does not normally sell of individuals, had agreed to supply petitioner with appliances at wholesale *159 prices because Joseph M. Zamonski was acquainted with petitioner. Local 639 had unsuccessfully attempted to organize the drivers employed by the corporation. Some of the drivers had engaged in a strike during the summer of 1972 following an election in which Local 639 had lost its bid to become the exclusive bargaining representative of the drivers employed by the corporation. Zamonski was wary of selling to petitioner, and did so only after consulting with his attorney. Petitioner was slow to pay the bill for the appliances, and the corporation's credit department was initially unsuccessful in collecting. Zamonski called petitioner directly regarding the bill after being advised by petitioner's secretary that petitioner wanted to speak to him about it. Petitioner told Zamonski that Zamonski's employees had been dunning him for payment, and asked whether Zamonski could do him "any good." When asked what he meant, petitioner responded that he meant exactly what he had said, whether Zamonski could do him "any good." Zamonski responded that he had already done petitioner good by selling him appliances at wholesale prices, whereupon petitioner stated in an unpleasant tone that he *160 guessed he would have to pay the bill. Although petitioner eventually paid the bill, the tone of the conversation convinced Zamonski that petitioner was attempting to obtain the appliances for nothing. 3. Furniture - In January of 1974, petitioner called Allen G. Seigel, a labor attorney. Seigel represented a furniture retailer that employed members of Local 639. Petitioner told Seigel that he wanted to purchase furniture from the retailer and stated that he wanted to receive a discount. After a pause, he told Seigel that some companies would give him the furniture for nothing. Following the conversation, Seigel warned the retailer to deal with petitioner only on an arm's-length basis. 4. Concrete - In late 1976 or early 1977, petitioner spoke with Norman R. Buchsbaum, a labor attorney. Buchsbaum represented Contee Sand and Gravel Company ("Contee"), and was in the process of negotiating a labor agreement for that firm with Local 639. Petitioner told Buchsbaum that he needed concrete to install light poles for a tennis court behind his home, and that he wanted Contee to supply the concrete. Buchsbaum explained to petitioner that he knew nothing about selling concrete, *161 and suggested that petitioner deal with Contee directly. When petitioner called Contee, he was referred back to Buchsbaum, and Buchsbaum agreed to look into the matter for him. Buchsbaum called Contee and advised it not to do business with petitioner. He warned Contee that dealing with petitioner could create an appearance of impropriety, and told Contee that he believed that petitioner did not want to pay for the concrete. Buchsbaum advised Contee to procrastinate and hope that petitioner would drop his request. Petitioner persisted in his request. His secretary called and advised Buchsbaum to obtain the concrete for petitioner if he wanted to get along with petitioner. Petitioner himself called Buchsbaum and insisted that he wanted the concrete. Contee eventually supplied petitioner with concrete after Buchsbaum advised it to sell him the concrete on the same terms that it would sell the concrete to anyone else. After he received the bill for the concrete, petitioner called Buchsbaum. He told Buchsbaum that the company "must be * * * crazy" to send him a bill. Buchsbaum advised petitioner that Contee expected the bill to be paid. When petitioner received follow-up bills *162 from Contee he told Buchsbaum to tell Contee to take the bills and "shove them." Petitioner eventually paid the bill after he left office and was sued by Contee. Petitioner reported as gross income in 1973, inter alia, the value of his personal use of an automobile owned by Local 639 and the value of personal meals for which he was reimbursed by Local 639. Petitioner reported total income of $ 22,826.22 and $ 43,612.85 on his 1972 and 1973 returns, respectively. Respondent's Audit
Respondent audited petitioner's 1972 and 1973 returns and determined by notice of deficiency dated November 21, 1985, that petitioner had fraudulently underreported his income by $ 18,980 in 1972 and by $ 154,538 in 1973. Respondent determined that the unreported income had been provided to petitioner in the form of goods and services as follows: 1972
1973
Design Work on Beach House
By Picardat
$ 5,120
By Engineering Firm
1,860
Design Work on Main House
By Picardat
12,000
Carpet from Giant
$   7,070
Difference Between Cost Incurred
by Lyon Builders and Amount
[5] 144,423
Paid by Petitioner
Excavation Work Performed on
Main House by Excavation-
Construction and Not Billed
to Petitioner or Lyon Builders
3,045
Totals
$ 18,980
$ 154,538
*163 ULTIMATE FINDINGS OF FACT 1. Petitioner accepted design services from Giant in 1972 without intending to pay for the services. Giant did not intend to collect for the design services, but instead provided the services to maintain labor peace. 2. Petitioner accepted carpet from Giant in 1973 without intending to pay for it. Giant decided in 1973 to forgo collecting for the carpet in order to avoid the labor problems it feared would result if it irritated petitioner. 3. Petitioner accepted construction work in 1973 from Lyon Builders and Excavation-Construction, intending to pay for it less than its fair market value. Lyon Builders and Excavation-Construction decided in 1973 to forgo collecting the difference from petitioner to avoid the labor problems they feared would result if they irritated him. 4. There were underpayments of tax in each year at least part of which were due to petitioner's fraud. OPINION I. Fraud
The statute of limitations precludes respondent's assessment and collection of the deficiencies at issue unless respondent *164 proves that petitioner's returns were false or fraudulent with the intent to evade tax so that the tax may be assessed "at any time." Secs. 6501(a), (c)(1). The burden that respondent bears in proving fraud under section 6501(c)(1) is the same burden that he bears in establishing fraud for purposes of the section 6653(b) addition to tax. Ruidoso Racing Association, Inc. v. Commissioner,476 F.2d 502, 505, 507, (10th Cir. 1973), affg. T.C. Memo. 1971-1974; Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3d Cir. 1967), revg. 46 T.C. 622 (1966). Respondent must establish by clear and convincing evidence (1) that petitioner underpaid his taxes during each year, and (2) that some part of petitioner's underpayment each year was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). After carefully considering the entire record, we conclude that respondent has carried his burden. A. Underpayments. Respondent has established by clear and convincing evidence an underpayment of tax for each year in issue. We found as a fact that Giant provided petitioner with the design services of *165 Picardat during 1982. It is well established that gross income can be received in the form of services. Adams v. United States,585 F.2d 1060, 1063 (Cl. Ct. 1978); sec. 1.61-1(a), Income Tax Regs. Employees of Giant testified that it provided the services to petitioner to reduce the risk of labor problems. In these circumstances, we are satisfied that the services were not provided to petitioner by Giant out of detached and disinterested generosity and that petitioner accordingly received gross income in the amount of the value of the services. See Commissioner v. Duberstein,363 U.S. 278, 285 (1960); sec. 1.61-2(d)(1), Income Tax Regs. We found as a fact that petitioner received carpet from Giant in 1973 that he never intended to pay for. We similarly found as a fact that Giant decided in 1973 not to enforce petitioner's obligation to pay for the carpet. It is well established that gross income can be received in the form of property. Bartlett v. Commissioner,71 F.2d 601, 602 (4th Cir. 1934), affg. 28 B.T.A. 285 (1933); sec. 1.61-1(a), Income Tax Regs. It is similarly well established that a gain "constitutes *166 taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States,343 U.S. 130, 137 (1952) (emphasis added); see Commissioner v. Glenshaw Glass Co.,348 U.S. 426 (1955). Although petitioner may have legally been indebted to Giant for the carpet, Giant's unwillingness to enforce the obligation gave petitioner total control over the carpet as a practical matter. In these circumstances, we have no difficulty in concluding that petitioner realized taxable income in 1973 when he accepted the carpet from Giant without intending to pay for it. See James v. United States,366 U.S. 213, 219 (1961); sec. 1.61-2(d), Income Tax Regs.
B. Fraud. Fraud is established if it is shown that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), *167 affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud must never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). It may, however, be proven by circumstantial evidence as direct proof of a taxpayer's intent is often not available. Korecky v. Commissioner,781 F.2d 1566, 1568 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. Petitioner's entire course of conduct may be examined in order to determine whether fraud is present. Korecky v. Commissioner, supra at 1568; Stone v. Commissioner,56 T.C. 213, 224 (1971). Although civil fraud must be proven by clear and convincing evidence, it need not be proven "beyond a reasonable doubt." Rule 142(b); Webb v. Commissioner,394 F.2d 366, 380 (5th Cir. 1968), affg. T.C. Memo. 1966-81. We have already concluded that the record clearly and convincingly establishes that petitioner received unreported income from Giant in 1972 and 1973 in *168 the form of design services and carpet, respectively. Petitioner's explanations for his failure to report the income determined by respondent simply did not ring true, particularly in light of the ample evidence contained in the record that petitioner made it a practice to use his influence to attempt to obtain goods and services free or at reduced rates from businesses over which his union had influence. [6] With respect to the design services supplied to petitioner by Giant, petitioner would have us believe that he thought that Picardat performed the design services for him as a personal favor, and that he believed he adequately reciprocated for those favors by taking Picardat out to meals, buying him scotch, and employing the services of his lawn care firm. We find this explanation to be incredible considering that the evidence establishes that petitioner requested Picardat's help from Giant rather than from Picardat himself. Had petitioner truly thought that Picardat was willing to perform the services as a personal favor, we believe that petitioner would have contacted Picardat directly. In addition, the record fails to establish any personal relationship whatsoever between *169 Picardat and petitioner that would lead Picardat to perform over 1,000 hours of services for petitioner as a personal favor in return for items of token value. With regard to the carpet, we found as a fact that petitioner took the carpet without intending to pay for it. Petitioner testified that he informed Dobbin that he was not paying for the carpet due to a contract dispute with Lyon Builders, and that Dobbin told him that he need not pay for the carpet until the dispute was resolved. Petitioner's testimony as to his understanding with Giant was contradicted by Dobbin's testimony. Dobbin denied both that petitioner had told him that he was not paying for the carpet due to a contract dispute, and that he had told petitioner that petitioner need not pay for the carpet until the dispute was resolved. We found *170 Dobbin's testimony to more credible than petitioner's. Petitioner's testimony that he recognized that he would owe for the carpet if Lyon Builders did not pay was unpersuasive considering the fact that Giant was forced to write the bill off. In sum, we did not believe petitioner's explanation of why he did not report the carpet as income. The fact that petitioner reported the value of his personal use of an automobile supplied him by Local 639 as gross income convinces us that he was aware that gross income includes noncash accessions to wealth. In these circumstances we can only conclude that petitioner's consistent failure to report as income the value of goods and services supplied to him due to his position as president of Local 639 was due to fraud. [7]
*171 Based upon all of the evidence in this case, we conclude that respondent has proven by clear and convincing evidence that a portion of petitioner's underpayment in tax for both of the years at issue was fraudulent with the intent to evade tax. We accordingly hold that respondent is not barred from assessing and collecting deficiencies for the years at issue by the statute of limitations, and that respondent's determination of an addition to tax for fraud for each year is sustained. II. Unreported Income
Having concluded that the statute of limitations is open on the assessment and collection of deficiencies for the years at issue, we must next decide whether respondent properly determined petitioner's unreported income. Petitioner has the burden of proving that respondent improperly determined the unreported income. Rule 142(a); Zack v. Commissioner,692 F.2d 28, 29 (6th Circ. 1982), affg. T.C. Memo. 1981-700, cert. denied 460 U.S. 1084 (1983). Respondent determined that petitioner received unreported income in the form of goods and services. As we discussed supra, it is well established that gross income can be received *172 in the form of goods and services. The amount of gross income received by petitioner is the difference between the fair market value of the goods and services that he received, and the amount that he paid for them. See sec. 1.61-2(d)(2), Income Tax Reg. Fair market value is measured as of the time the goods and services were received by petitioner. Bartlett v. Commissioner,71 F.2d at 602. The fair market value of goods and services is normally the amount charged by the providers of the goods and services. Rooney v. Commissioner,88 T.C. 523, 527-528 (1987). Respondent determined that petitioner received five specific items of unreported income. We discuss each of them in turn below. 1. Beach House Design Work - Respondent determined that petitioner received a total of $ 6,980 of income in 1972 from the design work on his planned beach house. Respondent determined that $ 5,120 of that amount resulted from design services supplied by Picardat, and that $ 1,860 of that amount resulted from Giant's payment of the design services rendered by an engineering firm. Picardat testified that his fee for the design services that he performed on *173 the beach home would have been approximately $ 2,400. [8] We accordingly hold that petitioner received $ 2,400 of income from those services. The engineering firm billed Giant $ 1,860 for services performed for the beach house, and Giant paid the bill. Petitioner produced no evidence that the $ 1,860 billed by the engineering firm is more than fair market value of the services that it performed. The fact that Giant paid the bill indicates that is was reasonable. We accordingly hold that petitioner received $ 1,860 of income from Giant's payment of the engineering firm's bill. In sum, we conclude that petitioner received $ 4,260 of income from the design work supplied by Giant for his beach house. 2. Davidsonville Home Design Work - Respondent determined that petitioner received $ 12,000 of income in 1972 from the design work on his Davidsonville home. Respondent determined that $ 12,000 was the value of the design services that Picardat performed on the home during 1972. We found as a fact that Picardat devoted approximately *174 1,000 hours to designing the house and that Lyon Builders contracted to build the house in accordance with the plans for $ 170,000. Picardat testified that his fee for designing the home would have been either 10 percent of the cost of constructing the home or $ 30 an hour. By either measure of the value of his services, the value of the design services rendered by Picardat exceeds the $ 12,000 determined by respondent. [9] There is no evidence that petitioner paid Giant anything for the design services. We accordingly hold that petitioner has failed to prove that he received less than $ 12,000 of income from the design services supplied by Giant. 3. Carpet - Respondent determined that petitioner received $ 7,070 of income in 1973 from carpet supplied to him by Giant. As we discussed supra, we are satisfied that the value of the carpet was income to petitioner in that year regardless of whether or not petitioner was legally indebted to Giant for it. The value of the carpet had been received by petitioner in 1973 as a practical matter as Giant did not intend *175 to enforce his obligation to pay. Rutkin v. United States, supra at 137. Giant billed petitioner the $ 7,070 determined by respondent, and there is no evidence that the carpet was worth less than that amount. We accordingly hold that petitioner has failed to prove that he received less than $ 7,070 of income from the carpet. 4. Davidsonville House - Respondent determined that petitioner received $ 144,423 of income in 1973 from construction work performed on his home constructed in Davidsonville. That amount represents the difference between the $ 279,423 that respondent determined that the house cost Lyon Builders to construct and the $ 135,000 that respondent determined that petitioner paid. On brief, respondent states that the house cost Lyon Builders $ 273,598.70 to construct, and that petitioner accordingly had income from the house of $ 138,598.70. We treat this as a concession, pro tanto, of the $ 144,423 that respondent determined. Cf. Malone v. Commissioner,T.C. Memo. 1987-300 n. 10. Petitioner advances two arguments on brief as to why respondent's determination is erroneous. First, petitioner argues that petitioner could *176 not have realized taxable income from the transaction in 1973 because he had not received a written demand from Lyon Builders for extra costs until 1975. We disagree. We found as a fact that a representative of Lyon Builders met with petitioner in late 1973 to discuss the bill for the house, and that they notified him then that Lyon Builders was seeking costs that exceeded the amount he had paid by approximately $ 150,000. At that point, petitioner was aware that Lyon Builders had incurred, and was seeking to be paid for, costs significantly in excess of the amount he had paid. We consider it to be inconsequential that petitioner may not have received a written bill for the exact amount demanded by petitioner until later. As we have already discussed, the determination of when a petitioner received income in these circumstances hinges on when, as a practical matter, he had such control over the asset that had been constructed for him that it can properly be viewed as income to him. Rutkin v. Commissioner, supra at 137. We conclude that petitioner received the income from the house in 1973. At that point, the construction had been completed and Lyon Builders had released *177 its lien on the house. The facts of this case demonstrate that any legal right that Lyon Builders retained after that point to recover its excess costs from petitioner was of no practical importance as Lyon Builders was afraid to exercise that right. Second, petitioner argues that any costs incurred in excess of the contract price represent a "builder's loss." Petitioner argues that Lyon Builders contracted to build the house for a fixed price of $ 170,000 and assumed the risk that the house would cost more than that to construct. The record contains a great deal of testimony regarding the work performed by Lyon Builders. The testimony of Lyon, Robert Jenkins, and Paul Facchina, each of whom were involved in the construction of the house on behalf of Lyon Builders, convinces us that much of the work performed on the house was not covered by the plans prepared by Picardat, and thus was not covered by the fixed price contract. [10] The testimony of petitioner and his witnesses fails to convince us that the value of the construction was less than respondent concedes on brief. We consider petitioner's testimony as the the many defects contained in the house to be unpersuasive. The *178 examples contained in the record of petitioner's dealings with other business that employed members of Local 639 suggests to us petitioner had regular disputes over bills from those businesses which resulted from his attempts to obtain goods and services free or for large discounts rather than from genuine dissatisfaction with the quality of goods and services. The record contains no evidence that petitioner made an honest attempt to settle his dispute with Lyon Builders. It instead indicates that he ignored the steps taken by Lyon Builders to settle the dispute. We view petitioner's conduct as more reflective of an attempt to use his position to obtain work for less than it fair market value than as reflective of an honest attempt to settle the dispute. Although Charles H. Smith testified for petitioner that he would have built the house for $ 206,000 in 1979, and that his cost would have been lower in 1973, we consider his testimony to be unpersuasive. [11] His estimate was made six *179 years after the house was constructed, and he was well aware that he was not going to be called upon to build the house for that amount. We consider the $ 210,000 estimate obtained by Picardat before construction started to be more significant. That estimate, which did not include the many changes from the plans which were made at petitioner's request, was made closer to the time of construction by a builder who presumably wanted the work. The builder who gave that estimate was unwilling to commit to build the house for that amount. In these circumstances, we would expect the $ 210,000 estimate to be low. Considering the many changes subsequently made to the house, we are unconvinced that the costs incurred by Lyon Builders do not reflect the fair market value of the construction services petitioner received. We conclude that petitioner has failed to prove that he received less income from the house than the $ 144,423 determined by respondent, less the $ 5,824.30 conceded by respondent on brief. 5. Excavation Work - Respondent determined that petitioner received *180 $ 3,045 of income in 1973 from excavation work performed by Excavation-Construction, for his house in Davidsonville. Respondent determined that petitioner was not billed for the work. Petitioner introduced no evidence that the work was not performed or that the value of the work was less than determined by respondent. We accordingly hold that petitioner has failed to prove that he did not receive $ 3,045 of income from the excavation work. In sum, we hold that petitioner has failed to prove that he received less than the following amounts of income from goods or services provided to him free or at less than their fair market value due to his position as president of Local 639: [12]
1972
1973
Design Work on Beach House
By Picardat
$  2,400
By Engineering Firm
1,860
Design Work on Main House
By Picardat
12,000
Carpet from Giant
$   7,070.00
Difference Between Cost Incurred
by Lyon Builders and Amount
Paid by Petitioner
138,598.70
Excavation Work Performed on
Main House by Excavation-
Construction and Not Billed
to Petitioner or Lyon Builders
3,045.00
Totals
$ 16,260
$ 148,713.70
*181 To reflect the foregoing, FDecision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioner's wife is not a party to this case because the notice of deficiency was addressed to petitioner individually. The return for 1972 was received by respondent by August 17, 1973. The return for 1973 was received by respondent by October 18, 1974. ↩
3. A cost-plus contract insulates builders from the risk that they will incur costs in excess of their estimates by providing that they will be paid their building costs plus a started profit. ↩
4. The $ 135,000 was disbursed to Lyon Builders from funds that petitioner had borrowed for the home. ↩
5. Respondent determined that the house cost Lyon Builders $ 279,423 to construct and that petitioner paid $ 135,000. ↩
6. We are not required to accept testimony at face value, nor that which we consider to be inherently improbable. Urban Redevelopment Corp. v. Commissioner,294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960); Archer v. Commissioner,227 F.2d 270, 273↩ (5th Cir. 1955), affg. a Memorandum Opinion of this Court. 7. A consistent pattern of failing to report amounts of income which are substantial in relation to the income reported is persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. T.C. Memo. 1968-123, cert. denied 397 U.S. 962 (1970); Romm v. Commissioner,245 F.2d 730, 734 (4th Cir. 1957), affg. on this issue T.C. Memo. 1956-104, cert. denied 355 U.S. 862↩ (1957). 8. Picardat testified that his design fee would have been $ 5,400, less $ 3,000 for mechanical and electrical plans that he did not complete. ↩
9. Respondent does not argue that petitioner received more than $ 12,000 of income from the design services. ↩
10. Lyon testified that his bill to petitioner reflected allowances to petitioner for the items that had been included in the original plans but which were excluded from the house constructed. ↩
11. Smith testified that his cost would have been $ 170,000, and that his profit would have been $ 36,000. ↩
12. We feel compelled to comment at this point regarding the briefs filed by the parties in this case. Rule 151(e)(3) provides that "In an answering or reply brief, the party shall set forth his objections, together with his reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which his objections are directed * * *." Our fact finding was hampered by petitioner's failure to set forth any specific objections in his reply brief to respondent's proposed findings of fact. Rule 151(e) (5) provides that briefs shall contain an "Argument, which sets forth and discusses the points of law involved and any disputed questions of fact." The argument sections of respondent's two briefs cite to a total of only three authorities, two of which are Tax Court Rules allocating the burden of proof, and consist almost entirely of a discussion of the facts at issue. This does not indicate to us that respondent made a good faith effort to support his position with sound legal analysis. ↩